**Robert CLARK, an individual, and A.D.A. Access Today, a Non–Profit Pennsylvania Corporation, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**MCDONALD'S CORPORATION and Ygraine, LLC, on behalf of themselves and all others similarly situated, Defendants.**

No. CV 02–0247(RBK).

United States District Court, D. New Jersey.

March 3, 2003.

---

Brodsky & Smith LLC, by Jason Brodsky, Esq., Evan Smith, Esq., Cherry Hill, NJ, Berger & Montague, P.C., by Todd S. Collins, Esq. pro hac vice, Douglas M. Risen, Esq. pro hac vice, Jacob A. Goldberg, Esq., pro hac vice, Philadelphia, PA, for Plaintiffs.

Brown Raysman Millstein, Felder & Steiner LLP, by Joel L. Finger, Esq., Morristown, NJ, Holland & Knight LLC, by Mark L. Shapiro, Esq., pro hac vice, Chicago, IL, for Defendant McDonald's Corporation.

Lee & McFarland, by Robert B. McFarland, Esq., Camden, NJ, Baker & Mckenzie, by Kevin S. Simon, Esq., pro hac vice, Gerald L. Maatman, Jr. Esq., pro hac vice, Craig R. Annunziata, Esq., pro hac vice, Chicago, IL, for Defendant Ygraine, LLC.

KUGLER, District Judge.

Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns ... or operates a place of public accommodation." *Id.* § 12182(a). The fast food restaurants owned and operated by Defendants McDonald's Corporation ("McDonald's") and its franchisee Ygraine, LLC ("Ygraine") are places of public accommodation that are alleged by Plaintiffs Robert Clark, a wheelchair-bound paraplegic, and A.D.A. Access Today ("Access Today"), a non-profit association, to contain "architectural barriers" that discriminate against disabled persons in violation of Title III, as well as the anti-discrimination laws of nine States. This suit for injunctive relief and damages was commenced as a bilateral class action on January 22, 2002, by the filing of Plaintiffs' original complaint. *See* Fed.R.Civ.P. 3. After McDonald's moved to dismiss, Plaintiffs amended their pleading as of right on September 20, 2002. *See* Fed.R.Civ.P. 15(a). Pending before the Court are the motions of McDonald's (1) to dismiss the amended complaint, or in the alternative, to dismiss or strike its class action allegations, and (2) for a more definite statement. Ygraine has joined in McDonald's motions without submitting separate moving papers. The Court heard oral argument on the motions on January 28, 2003, and for the reasons that follow, grants in part and denies in part both motions.

## I. BACKGROUND

Plaintiff Clark resides in Pennsylvania and has "visited numerous McDonald's brand restaurants, within the State of New Jersey and elsewhere." (Am.Compl.¶ 11.) Specifically, Clark is alleged to have visited each of 23 corporate-owned McDonald's restaurants in New Jersey, (*id.* ¶ 38(1)-(23)), as well as some (the amended complaint does not specify which) of 38 franchised restaurants in New Jersey and Pennsylvania, (*id.* ¶ 38(1)-(38)). As to these 38 franchises, if Clark himself has not visited the franchise, then "at least one member" of Access Today has done so. (*Id.*) The McDonald's restaurant in Blackwood, New Jersey, which is the only facility identified in the amended complaint to be operated by franchisee Ygraine, (*see id.* ¶ 21), has been visited by "at least one member" of Access Today, (*see id.* ¶ 38(23)), but it is not alleged that Clark himself was the visitor. The amended complaint also identifies 32 corporate-owned McDonald's restaurants in Wisconsin, (*id.* ¶ 39(1)-(32)), but it is not alleged that Clark, or any other member of Access Today, has actually visited these restaurants. As to the Wisconsin restaurants, it is only alleged—as it is with all McDonald's—brand restaurants nationwide—that Access Today's members "and other similarly situated persons *either* regularly enter and/or use [such] restaurants, would like to enter and/or use [such] restaurants, *or* may enter and/or use [such] restaurants in the future." (*Id.* ¶ 51 (emphasis added).)

Plaintiff Access Today is a non-profit national advocacy organization headquartered in the Delaware Valley, the "purpose" of which "is to educate persons and businesses on accessibility issues and to ensure full participation of all people with a broad range of physical disabilities in every community." (*Id.* ¶¶ 13–14.) The organization's members include disabled and non-disabled persons who live throughout the United States. (*Id.* ¶¶ 13, 17.) In furtherance of its purpose, Access Today is alleged "to monitor places of public accommodation for compliance with the ADA, [to] disseminate that information to its members and other disabled persons, and [to] ensure that people with disabilities have

equal access to, and do not encounter discrimination in, places of public accommodation." (*Id.* ¶ 14.) Access Today claims that it enjoys "organizational standing" to bring this action in its own right, as well as "associational standing" to bring this action on behalf of its disabled members.

The gravamen of the amended complaint is that McDonald's brand restaurants throughout the United States discriminate against disabled persons (1) in contravention of 42 U.S.C. § 12182(b)(2)(A)(iv) by "fail[ing] to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities ... where such removal is readily achievable," (2) in contravention of 42 U.S.C. § 12183(a)(2) by, with respect to altered facilities, "fail[ing] to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs," and (3) in contravention of 42 U.S.C. § 12183(a)(1) by "fail[ing] to construct and design [new] facilities ... that are readily accessible to and usable by individuals with disabilities, except where ... structurally impracticable." (*See id.* ¶ 42.) Plaintiffs rely principally upon the Defendants' alleged non-compliance with certain of the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), found at 28 C.F.R. part 36 Appendix A. (*See id.* ¶ 46(a)-(z).) Plaintiffs also contend that Defendants' violations of the ADA constitute per se violations of certain anti-discrimination statutes of the States of New Jersey, California, Vermont, Arizona, Wisconsin, Idaho, Ohio, Nevada and Michigan, each of which are said (unlike Title III) to permit recovery in damages.

Plaintiffs seek injunctive relief under the ADA on behalf of a class of disabled individuals against a class of "owner/operators of McDonald's brand restaurants" of which individual Defendants McDonald's and Ygraine are said to be representative. The "Plaintiff Class" is defined in the amended complaint as "all disabled persons, as that term is defined by the ADA, residing throughout the

# 204

United States of America."[1] (*Id.* ¶ 2.) The "Defendant Class" consists of "all owner/operators of McDonald's brand restaurants throughout the United States." (*Id.* ¶ 4; *see id.* ¶ 28.)

Plaintiffs also seek damages and injunctive relief under the anti-discrimination statutes of the States of New Jersey, California, Vermont, Arizona, Wisconsin, Idaho, Ohio, Nevada and Michigan on behalf of a subclass of disabled patrons against a subclass of restaurant "owner/operators" in those States, of which individual Defendants McDonald's and Ygraine are again said to be representative. (*Id.* ¶ 5.) The Plaintiff Subclass consists of "disabled persons ... residing in the States of New Jersey, California, Vermont, Arizona, Wisconsin, Idaho, Ohio, Nevada, and Michigan (the 'Subclass States')."[2] (*Id.* ¶ 3.) The Defendant Subclass consists of "all owner/operators of McDonald's brand restaurants throughout the Subclass States." (*Id.* ¶ 5; *see id.* ¶ 28.)

In their amended complaint, Plaintiffs specify Rule 23(b)(2) as the appropriate basis for the class certifications they propose. However, in a footnote in their memorandum of law opposing Defendants' motion to dismiss, Plaintiffs have also proposed certification under Rule 23(b)(3).

## II. DISCUSSION

The principal argument raised by the Defendants in support of their motion to dismiss is that Plaintiffs lack standing to bring this suit. Even if Plaintiffs enjoy standing, say the Defendants, they cannot satisfy the requisites of Rule 23 for maintenance of the suit as a class action, such that, at a minimum, the class action allegations must be dismissed or stricken. Although Plaintiffs respond to both of these arguments, they argue that the latter is "improperly premature" in a Rule 12 posture. (Pls.' Mem. Law Opp'n Def.'s Mot. Dismiss Am. Compl. at 17.) Instead, contend Plaintiffs, whether a class action may be maintained is a question properly deferred until such time as Plaintiffs move, under Rule 23, for class certification. A preliminary issue, therefore, is whether, or to what extent, the Court may consider Defendants' Rule 23 arguments under the procedural posture of this case.

■ In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), the Supreme Court observed that in cases where class certification issues are " 'logically antecedent' to Article III concerns and themselves pertain to statutory standing," then the issue of Rule 23 certification should be treated before standing. *Id.* at 831, 119 S.Ct. 2295 (citation omitted). This is an exception to the usual rule that standing is a threshold question that must be decided prior to class certification issues. The *Ortiz* exception appears "to rest on the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir.2002). Accordingly, Rule 23 certification should be addressed first in those cases where it is the possibility of class certification that gives rise to the jurisdictional issue as to standing. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 n. 2 (5th Cir. 2002). Stated differently, the *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class. *See id.*

---

1. The Plaintiff Class is alternatively defined in the amended complaint as "all people in the United States with physical disabilities as that term has been defined by 42 U.S.C. [§ ] 12102(2), including those persons with a physical impairment that substantially limits a major life function, such as mobility, hearing and/or sight, who have been and who were, prior to the filing of this [action], denied the full and equal enjoyment of the goods, services, programs, facilities, privileges, advantages, or accommodations of any of the McDonald's brand restaurants located in the United States, because of their respective disabilities." (Am.Compl.¶ 25.)

2. The Plaintiff Subclass is also defined as a "subset of the Plaintiff Class" consisting of "those Plaintiff Class members who reside in, travel to, and/or patronize or but for the violations herein complained of would patronize the McDonald's brand restaurants located in the Subclass States." (Am.Compl.¶ 26.)

This is a case, like *Ortiz*, in which certain issues of class certification are "logically antecedent" to those of standing. In particular, the Defendants' argument that Clark does not enjoy standing to assert claims on behalf of class members regarding restaurants that Clark has not visited, or in states Clark has not visited, is an issue that simply would not arise but for Clark's capacity as a putative class representative. *Cf. In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) (considering it appropriate, under *Ortiz*, to decide class certification before resolving Article III standing challenges, where defendant had argued that putative representative plaintiffs, who had purchased defendant's product in only 15 states, lacked standing to assert claims on behalf of purchasers in the remaining 35 states). On the other hand, the Defendants' argument that Access Today enjoys neither organizational standing nor associational standing is an issue that would exist regardless of whether Access Today brought suit individually or on behalf of a putative class. Accordingly, the Court shall address Access Today's standing before addressing issues of class certification, but shall address issues of class certification (insofar as the propriety of certification turns on matters of law that can be resolved under the procedural posture of this case[3]) before addressing the question of Clark's standing.

## A. RULES OF STANDING

### 1. PROCEDURAL RULES APPLICABLE WHEN A CHALLENGE TO STANDING IS MADE ON THE BASIS OF THE PLEADINGS

Standing "is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution." *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir.1997); *see Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The party invoking federal jurisdiction bears the burden of establishing standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *accord FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir.1996).

At the pleading stage, therefore, the plaintiff must allege facts sufficient to establish his standing to invoke the court's jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. Thus, [plaintiffs] in this case must allege facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." (internal alterations, omissions, quotation marks, and citations omitted)); *Warth v. Seldin*, 422 U.S. 490, 517–518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The rules of standing ... are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir.1999) ("Standing is established

---

**3.** A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met. *See Miller v. Motorola, Inc.*, 76 F.R.D. 516 (N.D.Ill.1977) (granting motion to strike class action allegations on the basis of the complaint); *see also Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Sometimes the issues are plain enough from the pleadings ..., and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Illinois v. Climatemp, Inc.*, No. 79 C 4898, 1981 WL 2033, at *2, *5 (N.D.Ill.1981) (rejecting plaintiff's argument that it would be procedurally improper to entertain defendant's motion to strike class action allegations in advance of a motion by plaintiff to certify class); Fed.R.Civ.P. 23(c)(1) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.").

at the pleading stage by setting forth specific facts [satisfying the elements of standing].");

▪▪▪ Although it is the duty of the plaintiff to "clearly and specifically set forth facts sufficient to satisfy [the] standing requirements," the level of specificity necessary to avoid dismissal for lack of standing should not be "exaggerated." *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 86–87, 88 (3d Cir.1991). At the pleading stage, the court may "presume that the general allegations in the complaint [as to standing] encompass the specific facts necessary to support those allegations." *Steel Co.*, 523 U.S. at 104, 118 S.Ct. 1003. Alternatively, however, it is "proper," and " 'within the trial court's power,' " even on a motion to dismiss, "to require the [plaintiff] to go beyond ... general allegations in the complaint and allege particularized facts supportive of its standing." *Newark Branch NAACP v. Town of Harrison*, 907 F.2d 1408, 1415 & n. 10 (3d Cir.1990) (quoting *Warth*, 422 U.S. at 501–02, 95 S.Ct. 2197). When a challenge to standing is made on the basis of the pleadings, as here, the court must " 'accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party.' " *Pennell v. City of San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (quoting *Warth*, 422 U.S. at 501, 95 S.Ct. 2197); *accord Penn. Psych. Soc'y v. Green Spring Health Services, Inc.*, 280 F.3d 278, 286 (3d Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 102, 154 L.Ed.2d 138 (2002).

## 2. *CONSTITUTIONAL STANDING REQUIREMENTS*

The Third Circuit has articulated three requirements for Article III constitutional standing:

(1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 484–85 (3d Cir.1998) (citing *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130); *accord Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175–76 (3d Cir.2000). These requirements have been described as "immutable," and as the "irreducible constitutional minimum" of standing under the "case or controversy" clause, *Fair Hous. Council v. Montgomery Newspapers*, 141 F.3d 71, 74 (3d Cir.1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), and *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130), language signifying not only that the plaintiff in every case must satisfy these "injury-in-fact," "causation" and "redressibility" elements, *id.*, but that they cannot be abrogated by legislative enactment, *see Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n. 24, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Montgomery Newspapers*, 141 F.3d at 74 (quoting *Bennett*, 520 U.S. at 162, 117 S.Ct. 1154). Relevant to the case at bar, the same three elements must be satisfied whether the plaintiff is an individual or an organization suing on its own behalf. *See Ass'n of Community Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir.1999); *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir.1991); *Am. Legal Foundation v. FCC*, 808 F.2d 84, 89 (D.C.Cir. 1987).

## 3. *PRUDENTIAL LIMITS ON STANDING*

▪▪▪ In addition to the requirements of Article III standing is a second tier of prudential limitations that "deal with who is authorized to invoke the courts' decisional and remedial powers." *Montgomery Newspapers*, 141 F.3d at 74. The Supreme Court has summarized these prudential limitations as follows:

Apart from [the] minimum constitutional mandate, this Court has recognized other limits.... First, the Court has held that

when the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. Second, even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. Without such limitations ... the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

*Warth,* 422 U.S. at 499–500, 95 S.Ct. 2197 (citations omitted); *accord Montgomery Newspapers,* 141 F.3d at 74–75. A third prudential limitation on standing is that the "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision ... invoked in the suit." *Bennett,* 520 U.S. at 162, 117 S.Ct. 1154; *accord Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 226 (3d Cir.1998).

■■■■■ Unlike the Article III standing requirements, the prudential standing limitations are "not the product of constitutional restraints on the power of the federal courts to hear cases." *Conte Bros.,* 165 F.3d at 227. Therefore Congress, in enacting particular legislation, "can eliminate prudential restrictions on standing if it so desires." *Id.; see Warth,* 422 U.S. at 501, 95 S.Ct. 2197 ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules."). As a matter of statutory interpretation, however, an enactment is presumed to incorporate background prudential standing principles "unless *expressly* negated by Congress." *Conte Brothers,* 165 F.3d at 227 (emphasis original) (citing *Bennett,* 520 U.S. at 164–65, 117 S.Ct. 1154).

#### 4. ASSOCIATIONAL STANDING

■■■■ Even where an association lacks standing to sue in its own right because it has not itself suffered an injury-in-fact, it will nevertheless have "standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Penn. Psych. Soc'y,* 280 F.3d at 283. The litigation tends to concentrate on the first and final prongs of this test, as it does in the case at bar.

■■■ In determining whether the first prong of this test is met, the court analyzes whether the individual members on whose behalf the suit is brought would themselves satisfy the tripartite Article III standing test had they sued individually. *See, e.g., Hosp. Council of W. Pa.,* 949 F.2d at 86–88. In determining whether the last prong of this test is met, the result often turns upon whether the claim advanced by the association on behalf of its members is for damages. It is almost a bright-line rule "that requests by an association for declaratory and injunctive relief do not require participation by individual association members," *id.* at 89, but conversely, "damages claims usually require significant individual participation, which fatally undercuts a request for associational standing," *Penn. Psych. Soc'y,* 280 F.3d at 284.

#### B. ACCESS TODAY LACKS ORGANIZATIONAL STANDING.

■■■ Defendants contend that Access Today lacks standing to sue on its own behalf, i.e., "organizational standing." In particular, it is Defendants' position, first, that the allegations in the complaint demonstrate that the only injury Access Today has suffered from the alleged discrimination at McDonald's brand restaurants is the deflection of organizational resources away from educational, informational, and counseling efforts towards the instant lawsuit, which, as a matter of Third Circuit precedent, is insufficient to satisfy the injury-in-fact prong of Article

III standing. Alternatively, Defendants contend that the language of the private enforcement provision of Title III only ·confers a cause of action ·upon a "person who is being subjected to discrimination," such that Access Today, which cannot fit that definition, lacks standing to sue on its own behalf. (*Id.* at 13–14.)

Defendants' first contention may be easily disposed of. In *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71 (3d Cir.1998), the Third Circuit held "that the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III." *Id.* at 80. In doing so, it agreed with the analysis set forth by the District of Columbia Court of Appeals that " '[w]ere the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.' " *Id.* at 79 (quoting *Spann v. Colonial Vill., Inc.,* 899 F.2d 24, 27 (D.C.Cir.1990)). Therefore Defendants are correct (and Plaintiffs concede) that Access Today must allege something more than litigation expense to establish an injury for constitutional purposes. However, a fair reading of the amended complaint reveals that it has done so. In particular, Access Today has alleged a "frustration of mission":[4]

> Access Today's goal of making public accommodations throughout the United States accessible to people with disabilities has been made more difficult for several reasons . . . :
>
> a. Defendants' discrimination, in and of itself, makes public accommodations in the United States less accessible to people with disabilities;
>
> b. Defendants' discrimination segregates people with disabilities, thereby perpetuating discriminatory attitudes in the public at large;
>
> c. *Defendants' discrimination has thus required, and continues to require, [Access Today] to make greater effort, and allocate additional resources, to counsel those injured by such discrimination, to educate the public that it is wrong to discriminate against people with disabilities, and otherwise to counteract the adverse impact of discrimination.*

(*Id.* ¶ 55(a)-(c) (emphasis added).)[5] This kind of injury to Access Today's mission is sufficient to constitute an injury-in-fact for Article III standing purposes. *See Montgomery Newspapers,* 141 F.3d at 76 ("[W]here discriminatory 'practices have perceptibly impaired [an organization's ability to carry out its mission], there can be no question that the organization has suffered an injury in fact.' " (second alteration original)) (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)).

■ On the other hand, Defendants' second argument is persuasive. Title III of the ADA proscribes discrimination in places of public accommodation against persons with disabilities, *see* 42 U.S.C. § 12182(a), and confers a private right of action for preventative relief, including an application for a permanent or temporary injunction or restraining order, *see id.* § 12188(a)(1) (referencing § 2000a–3(a)); *see also id.* § 12188(a)(2), upon "any person who *is being subjected to discrimination* on the basis of disability . . . or who has reasonable grounds for believing that such person *is about to be subjected to discrimination.*" *Id.* § 12188(a)(1) (emphasis added).[6] In the judgment of the Court,

---

4. Access Today seeks injunctive relief, not monetary damages, to remedy the injuries it is alleged to have suffered. (*See* Tr. Oral Arg. of 1/28/03 at 29:24–30:1.)

5. It is also alleged that Access Today "has been forced to divert resources from educational, informational, and counseling functions, towards its effort to combat Defendants' widespread discriminatory practices through legal proceedings." (Am. Compl. ¶ 54; *see also id.* ¶ 55(d).) The argument advanced by the Defendants focus-

es on this allegation to the exclusion of the above-quoted ones.

6. The private enforcement provision of Title III reads in full, as follows:

> **(a) In general**
>
> **(1) Availability of remedies and procedures**
>
> The remedies and procedures set forth in section 2000a 3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of

this language erects a prudential barrier precluding organizational standing to Plaintiff Access Today.

Both individuals and entities can suffer discrimination redressable under Title III of the ADA, as made clear by Title III's "association provision":

> It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or *other opportunities to an individual or entity* because of the known disability of an individual with whom the individual *or entity* is known to have a relationship or association.

42 U.S.C. § 12182(b)(1)(E) (emphasis added). However, the enforcement provision of Title III unambiguously requires that the "person" (be it an individual or entity) possessing the cause of action is being subjected, or is under threat of being subjected, to discrimination. Because there is no set of facts alleged in the amended complaint under which it could be said that Access Today is itself suffering, or under threat of suffering, discrimination at the hands of the Defendants, Access Today lacks standing to sue.[7] Stated otherwise, if the facts alleged in the amended complaint are assumed to be true, then Access Today has suffered *or is suffering* "frustration of mission" injuries as a result of the Defendants' discrimination *against others*, for which the ADA provides it no remedy.

The inability of Access Today to sue in its own right may be attributed to a prudential limitation on standing under Title III of the ADA. In that regard, the enforcement provision of Title III, conferring a cause of action upon "any person *who is being subjected to* discrimination on the basis of disability," *id.* § 12188(a)(1) (emphasis added), may be contrasted with those of Title I (prohibiting discrimination in employment), and Title II (prohibiting discrimination by public entities), both of which confer causes of action upon "any person *alleging* discrimination on the basis of disability," *id.* §§ 12117(a), 12133 (emphasis added). The more broadly worded language of the latter provisions has been observed to evince a congressional intention to define standing to bring a private action as broadly as is permitted by Article III of the Constitution, thus removing prudential barriers to standing. *See Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir.1997); *accord MX Group, Inc. v. City of Covington*, 293 F.3d 326, 333–35 (6th Cir.2002). Similarly, the enforcement provision of Title IV (prohibiting retaliation), which confers a cause of action upon "aggrieved persons," 42 U.S.C. § 12203(c), would appear so broad as to eliminate prudential standing limitations for a plaintiff suing under that Title. *Cf. Gen. Instrument Corp. v. Nu–Tek Elec. & Mfg., Inc.*, 197 F.3d

---

this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

**(2) Injunctive relief**

In the case of violations of sections 12182(b)(2)(A)(iv) and section 12183(a) of this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

42 U.S.C. § 12188(a).

**7.** Access Today has not relied upon the "association provision" in its arguments to the Court, nor do the allegations of the amended complaint fit the prototype for a claim of that sort. *Cf., e.g., Special Educ. Services v. RREEF Performance P'ship–I*, No. 95 C 6468, 1995 WL 745964 (N.D.Ill.Dec.11, 1995) (finding that tenant, a non-profit corporation operating a school for children with physical and mental impairments, had likely been subjected to discrimination under Title III of the ADA based upon its association with disabled students, where evidence suggested that landlord's decision not to renew the corporation's lease was motivated in part by a discriminatory animus against its disabled students); *cf. generally* 28 C.F.R. Pt. 36 App. B at 675 (2002) ("[Section 12182(b)(1)(E)] was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.").

83, 87–89 (3d Cir.1999) (congressional provision conferring standing on "any person aggrieved" held to constitute an explicit negation of prudential standing requirements).

By contrast, the enforcement provision of Title III has been held *not* to alter prudential standing requirements. *See Moreno v. G & M Oil Co.*, 88 F.Supp.2d 1116, 1117 (C.D.Cal. 2000) (concluding, as a matter of prudential standing, that the language of § 12188(a)(1), requiring "that a plaintiff actually be 'subjected to discrimination' or be 'about to be subjected' to it," did not permit a plaintiff encountering architectural barriers at one gas station to assert claims on behalf of others similarly situated with respect to 82 other gas stations that the plaintiff had not visited); *Hoepfl v. Barlow*, 906 F.Supp. 317, 323 & n. 13 (E.D.Va.1995) ("Congress would have to speak with definite clarity if it meant to grant standing to a plaintiff with no particularized injury who wished to assert the rights of others not before the Court. This statute is not an example of that definite clarity. Nothing in the language of either § 12188 or the [therein] cross-referenced § 2000a–3(a) suggests that it was intended to alter the normal prudential rules on standing." (footnote omitted)).[8]

■■■ The Court holds that the language of the enforcement provision of Title III of the ADA does not evince a congressional intent to eliminate a prudential barrier to the standing of an organization to sue to remedy injury it suffers as a result of discrimination against the disabled, where the organization is not itself being subjected to, nor is itself under threat of being subjected to, such discrimination.[9] The Court is guided by *Conte*

---

8. The Court is aware that other courts, without differentiating between the various ADA Titles, have taken a broad-brush approach "that Congress intended that standing under the ADA be limited only by the minimum constitutional constraints." *Liberty Resources, Inc. v. Southeastern Pa. Trans. Auth.*, 155 F.Supp.2d 242, 249–50 (E.D.Pa.2001) (Title II ADA case), *vacated as moot mem.*, No. 01–3702, 2002 WL 31859453 (3d Cir. Dec.23, 2002); *accord W.G. Nichols Inc. v. Ferguson*, No. Civ. A. 01–834, 2002 WL 1335118, at *14 & n. 24 (E.D.Pa. June 7, 2002) (observing that "nearly every other court to consider the issue of standing under the ADA has determined that prudential limitations thereon are inapplicable," but explicitly "not distinguish[ing] among claims arising under Titles I, II and III of that statute") (Title III ADA case). There has also been at least one court, *see Indep. Living Resources v. Or. Arena Corp.*, 982 F.Supp. 698, 760–61 (D.Or.1997), which appears to have found, without analyzing the language of § 12188(a)(1), that an organization had standing to sue on its own behalf under Title III of the ADA.

9. Of the three prudential rules identified *supra* Part II.A.3, the one implicated here is the general prohibition on a plaintiff "rest[ing] his claim to relief on the legal rights or interests of third parties" as opposed to his own rights and interests. *Cf. Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 320 (D.Mass.1997) ("The argument that BU's discrimination against learning disabled students causes [organizational plaintiffs] to spend money and thus gives them standing to sue within their own right 'falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" (quoting *Warth*, 422 U.S. at 509, 95 S.Ct. 2197)). The Third Circuit has explained that this rule

serves at least two judicial purposes. First, the rule fosters judicial restraint: courts faced with unsettled questions avoid pronouncements that are perhaps unnecessary and undesirable because the rightholders do not wish to assert their rights. Second, the rule assures concrete, sharp presentation of the issues and enables courts to avoid ruling on abstract grievances. Generally, the third party will be the best advocate of its own position. . . .

*Amato v. Wilentz*, 952 F.2d 742, 748 (3d Cir. 1991) (citations omitted).

It would frustrate both of these purposes to permit Access Today to assert the right of disabled individuals to be free from discrimination under the ADA as a vehicle to propel its own interest in being free from "frustration of mission" injury. First, it is apparent that the principal effect of granting Access Today organizational standing in the context of this case would be to facilitate the creation of a vast pool of franchisees against whom an injunction could issue to remedy Access Today's "frustration of mission" injuries. It is likewise apparent, in the context of Title III, that such an injunction would have to be mandatory and detailed, *e.g.*, *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1056–57 (5th Cir.1997), and Plaintiffs have in fact asked for an injunction of this type. (*See* Am. Compl. Prayer ¶¶ h-k.) Because a mandatory injunction is an "extraordinary remedy," *United States v. Bigan*, 274 F.2d 729, 733 (3d Cir.1960), which "should be used sparingly," *United States v. Price*, 688 F.2d 204, 212 (3d Cir.1982), it would seem peculiarly appropriate, and consonant with principles of judicial restraint, to require Access Today to demonstrate its entitlement to relief under Title III by reference to its own claim (if any it may have, *see* 42 U.S.C. § 12182(b)(1)(E)) rather than the claims of disabled individuals who have visited or attempted

*Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.*, 165 F.3d 221 (3d Cir.1998), in which the Third Circuit made clear that "Congress is presumed to incorporate background prudential standing principles, unless the statute expressly negates them." *Id.* at 227. In *Conte Bros.*, the Third Circuit compared the language "any person" as used in the Endangered Species Act of 1973, with the language "any person who believes that he or she is likely to be damaged," as used in the Lanham Act provision at issue in that case. *Id.* at 228. While the former was described as "an authorization of remarkable breadth when compared with the language Congress ordinarily uses," the panel found it "significant" that the latter "limit[ed] the class of persons entitled to sue to those who can trace their injury to the ... conduct proscribed by the act," and found no abrogation of prudential standing principles under the Lanham Act. *Id.*

The analysis in *Conte Bros.* is important because the enforcement provision of Title III is, if anything, more restrictive than the Lanham Act provision found *not* to negate prudential standing principles. In that regard, the language of § 12188(a)(1) does more than limit the class of persons entitled to sue to those who can *trace their injury to* proscribed discrimination; it limits the class to those who are being, or are under threat of being, *subjected to* proscribed discrimination. Thus, a comparison between the Lanham Act provision at issue in *Conte Bros.* and the ADA provision at issue here indicates both (1) that Congress did not employ language sufficient to abrogate prudential standing requirements under the latter, and (2) that Access Today's ability to trace its "frustration of mission" injuries to the proscribed conduct of the Defendants is not enough to demonstrate that it has been "subjected to" such conduct, as required by Title III.[10] Accordingly, prudential standing princi-

to visit McDonald's restaurants with ADA violations and elected not to sue.

Second, there is the risk that Access Today, by laying its claim for relief upon the rights of a vast array of individuals disabled in different ways and discriminated against at different restaurants, would be less able to make a "sharp presentation" concerning how any particular individual suffers a disability within the meaning of 42 U.S.C. § 12102(2), how the architecture at any particular McDonald's restaurant would discriminate against that person, or how a remedy could be fashioned to adequately redress discrimination in that instance.

**10.** The Court's determination (that Title III of the ADA does not abrogate prudential standing principles in such a way as to permit an organization who has not itself been subjected to discrimination to sue) is confirmed by the practical import of the contrary conclusion, which, as explained in *W.G. Nichols Inc. v. Ferguson*, No. Civ. A. 01–834, 2002 WL 1335118 (E.D.Pa. June 7, 2002), would render superfluous the earlier-quoted "association provision":

[N]ot every entity that is being tangibly harmed by a Title III violation has standing to sue under that provision. This is so ... because Congress itself has limited the class of parties on which that portion of the ADA bestows rights. Specifically, Title III grants rights only to disabled individuals and entities that have a known association or relationship with an individual with a known disability. *Under plaintiffs' formulation, this limitation would be rendered irrelevant, as any party who is in any way injured by a failure to comply with Title III's requirements would be able to bring suit there-*

*under regardless of whether it was discriminated against based on its disability or its association with a disabled individual.* Indeed, were the court to adopt the proposition urged by plaintiffs, a non-disabled but sensitive person who suffers emotional distress knowing, or seeing, that a particular disabled person is suffering continuing discrimination within the meaning of Title III would possess standing to enforce that provision.

*Id.* at *15 & n. 26 (emphasis added) (footnote omitted) (citing 42 U.S.C. § 12182(b)(1)(E)).

It may be observed that the *Ferguson* court itself "proceed[ed] on the assumption that Congress has done away with ... all ... prudential standing doctrines in the ADA context," choosing instead to rest its holding on "statutory standing" principles, *id.* at *15, which may alternatively be thought of as a "lack of a cause of action" under Title III, *id.* at *16 n. 32. Whether Access Today lacks organizational standing due to "prudential limitations" on standing, due to want of "statutory standing," or for "lack of a cause of action" is probably unimportant; the origin of each label may be traced to the same principle "that a statute ordinarily will not be interpreted to confer causes of action upon people whose only injuries derive from the violation of others' rights under the statute." *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C.Cir.1994). Therefore the "result remains constant" whichever label is applied. *Ferguson*, 2002 WL 1335118 at *16 n. 32; *cf., e.g., Gen. Instrument Corp. v. Nu–Tek Elec. & Mfg., Inc.*, 197 F.3d 83, 89 (3d Cir.1999) (concluding that enforcement provision of Cable Communications Policy Act

ples bar Access Today from enforcing the ADA on its own behalf.[11] The question to which the Court now turns is whether Access Today may enforce the ADA on behalf of its members.

## C. ASSOCIATIONAL STANDING OF ACCESS TODAY

Defendants contend that Access Today lacks associational standing to represent its members for failure to satisfy the first and last prongs of the *Hunt* test, identified *supra* Part II.A.4. The Court has little trouble concluding that Access Today lacks associational standing to advance on behalf of its members damages claims under the anti-discrimination statutes of the Subclass States. Whether Access Today enjoys associational standing to assert claims for declaratory and injunctive relief under the ADA, or under the anti-discrimination statutes of the Subclass States,[12] is a closer question.

### 1. ACCESS TODAY LACKS ASSOCIATIONAL STANDING TO ASSERT DAMAGES CLAIMS.

■ In *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 280 F.3d 278 (3d Cir.2002), the Third Circuit re-affirmed the relatively bright-line rule that " 'that an association's action for damages running solely to its members would be barred for want of the association's standing to sue.' " *Id.* at 284 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)). The underlying premise of this rule is that "damages claims usually require significant individual participation" as would flunk the third prong of the *Hunt* test. *Id.* There may be an exception to the rule forbidding associational standing on damages claims where an

association seeks only nominal damages on behalf of its members without reference to their individual circumstances. *See Fla. Paraplegic Ass'n v. Martinez*, 734 F.Supp. 997, 1000–01 (S.D.Fla.1990).

In this case, however, Plaintiffs seek "compensatory damages" for violations of the Subclass States' anti-discrimination laws, (Am. Compl. Prayer ¶ 1), which as a matter of state law, would need to be proven by reference to facts surrounding individualized incidents of disability-based discrimination suffered by Access Today's members at McDonald's brand restaurants in the Subclass States. *See, e.g., Long v. Coast Resorts, Inc.*, 32 F.Supp.2d 1203, 1208–09 (D.Nev. 1998) (observing that "[l]iability may not be found in a vacuum" and denying plaintiffs' motion for summary judgment as to liability for damages under Nev.Rev.Stat. § 651.090 where plaintiffs had "not show[n] that they were forced to seek accommodations elsewhere or even suggest[ed] that they were injured, monetarily, physically, or emotionally, by the [architectural barriers] which they saw"), *rev'd on other grounds*, 267 F.3d 918 (9th Cir.2001); *Boemio v. Love's Rest.*, 954 F.Supp. 204, 209 (S.D.Cal.1997) (finding that wheelchair-confined plaintiff forced to urinate in parking lot due to inaccessibility of restaurant restrooms had failed to prove damages above statutory minima of Cal. Civ. Code § 52 where such experience was "certainly disconcerting" but plaintiff had not "soiled himself, been observed by others, ridiculed, accosted or physically injured" or suffered property damage or criminal sanctions for his behavior). Thus, the significant individualized participation that would be required of its members precludes Access Today from pressing compensatory damages claims on their behalf.

conferred standing as broadly as the Constitution allowed whether understood as a negation of prudential standing limitations or as a matter of the statute's structure).

**11.** The Court has not been called upon to decide, and intimates no view, whether Access Today would enjoy organizational standing to assert claims under the antidiscrimination laws of the Subclass States, a question upon which nine

state courts of last resort are presumably the ultimate authorities.

**12.** In resolving the pending motions the Court assumes without deciding the correctness of Plaintiffs' theory that the ADA violations of which they complain would constitute per se violations of the anti-discrimination statutes of the Subclass States, entitling Plaintiffs to concomitant injunctive relief thereunder.

## 2. ACCESS TODAY ENJOYS ASSOCIATIONAL STANDING TO ASSERT INJUNCTIVE CLAIMS.

 It is a closer question whether Access Today lacks associational standing to pursue claims for declaratory and injunctive relief. Defendants have challenged Access Today's ability to meet the first and third prongs of the *Hunt* test. These prongs are addressed in reverse order.

### a. Individualized Participation of Access Today's Members on Injunctive Claims

Although it is usually the case "that requests by an association for declaratory and injunctive relief do not require participation by individual association members," *Hosp. Council of W. Pa.*, 949 F.2d at 89, that rule is not invariable. In *Pennsylvania Psychiatric Society*, the Third Circuit expressed doubt as to whether certain claims for declaratory and injunctive relief, brought by an association on behalf of its members, could be established without significant individual participation. *See* 280 F.3d at 286.

In that case, an association of licensed psychiatrists brought suit against Green Spring Health Services, Inc. ("Green Spring"), an administrator of managed health care plans that had entered into individual contracts ("Provider Agreements") with its member psychiatrists to form a "provider network" of psychiatric services. *Id.* at 281–82. The association also sued various health maintenance organizations ("HMOs") that had contracted with Green Spring to provide the psychiatric services to the HMOs' subscribers. *Id.* at 281. The association sought damages, as well as declaratory and injunctive relief, on the grounds that Green Spring and the HMOs (collectively, the "managed care organizations" or "MCOs") had unfairly profited at the expense of the association's members by

refus[ing] to authorize and provide reimbursement for medically necessary mental health treatment; interfer[ing] with patients' care by permitting non-psychiatrists to make psychiatric treatment decisions; violat[ing] Provider Agreements by improperly terminating relationships with certain psychiatrists; and breach[ing] the contractual duties of good faith and fair dealing by failing to timely pay psychiatrists and by referring patients to inconvenient treatment locations, thereby depriving some patients access to treatment.

*Id.* at 282.

The MCOs moved to dismiss the complaint for lack of the association's standing to sue on behalf of its member psychiatrists. *Id.* at 285. They argued that the medical coverage decisions on psychiatric care forming the basis for the association's allegations were "fact-intensive inquiries" that would flunk the third prong of the *Hunt* test. *See id.* The district court, canvassing the association's allegations, found that each would require "significant individual participation" by the association's member psychiatrists, and granted the MCOs' motion. *Id.* at 286.

On appeal, the Third Circuit "agree[d] that conferring associational standing would be improper for claims requiring a fact-intensive-individual inquiry," *id.*, which included the association's claims for damages on behalf of its members, *id.* at 284, 286 n. 6. As to the association's declaratory and injunctive claims, however, the Third Circuit reversed, basing its decision on allegations in the complaint which, taken as true, indicated that it might be possible for the association to establish those claims without significant individual participation:

[T]he Pennsylvania Psychiatric Society maintains the heart of its complaint involves systemic policy violations that will make extensive individual participation unnecessary. In effect, the Society contends the *methods* the MCOs employ for making decisions—e.g., authorizing or denying mental health services, credentialing physicians, and reimbursement—represent breaches of contract as well as tortious conduct. Therefore, insofar as its allegations concern *how* the MCOs render these decisions, the Society's complaint involves challenges to alleged practices that may be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations.

If the Pennsylvania Psychiatric Society can establish these claims with limited individual participation, it would satisfy the requirements for associational standing. While we question whether the Society can accomplish this, at this stage of the proceedings on a motion to dismiss for lack of standing, we review the sufficiency of the pleadings and must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff. For this reason, we believe the Society's suit should not be dismissed before it is given the opportunity to establish the alleged violations without significant individual participation....

*Id.* (emphasis original) (citations, internal quotation marks and alteration marks omitted).

This is a case, like *Pennsylvania Psychiatric Society,* in which the challenge to associational standing on declaratory and injunctive claims cannot be resolved in favor of the Defendants on the face of the pleadings. On the one hand, the establishment of Plaintiffs' claims would seem to require a fact-intensive inquiry, which appears to be confirmed by the non-exhaustive list of twenty-six ADA violations that Plaintiffs seek discovery to establish on a restaurant-by-restaurant basis. (*See* Am. Compl. ¶¶ 46–47.)

On the other hand, this fact-intensive inquiry, at least superficially, would not appear to require *any* testimony by Access Today's members. Presumably the question of whether a particular McDonald's location is an "existing facility," *see* 42 U.S.C. § 12182(b)(2)(A)(iv), an "altered facility," *see id.* § 12183(a)(2), or a "new facility," *see id.* § 12183(a)(1), could be established by the testimony of the Defendants' employees, or even third parties. Similarly, evidence regarding the Defendants' failure to satisfy the "readily achievable" standard for existing facilities, the "maximum extent feasible" standard for altered facilities, or the "unless structurally impracticable" standard for new facilities, could be established with non-member witnesses well-versed in such standards, as well as the ADAAG guidelines, and there would be nothing to limit such witnesses from testifying as to multiple or many Mc-

Donald's locations. The court in *American Disability Association, Inc. v. DI–MI Investments Corp.,* No. 01–6300–CIV (S.D.Fla. July 13, 2001), upon which Plaintiffs rely, echoed such a sentiment in denying a defendant's challenge to the standing of an associational plaintiff:

> [N]either the claim asserted, the violations of the ADA, nor the relief requested (a permanent injunction requiring the Defendant to make the facilities ... readily accessible to and usable by individuals with disabilities to the extent required by the ADA), requires the participation of individual members in the lawsuit. No individualized assessment of the Plaintiff's members must be made to determine what measures the Defendant must take in order to comply with the ADA.

Slip op. at 3–4.

Nevertheless, there are certain aspects of the injunctive relief sought by Access Today on behalf of its members that would appear to necessitate individual members' testimony. The "futile gesture" clause of Title III's enforcement provision states that "[n]othing [therein] shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1). This language has been interpreted to permit a disabled person to sue for injunctive relief under Title III to remedy an architectural barrier, even if he has not actually encountered it, so long as he both has knowledge of its existence and would otherwise visit the public accommodation. *See Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133, 1136–37 (9th Cir.2002) ("[U]nder the ['futile gesture' language] of the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury."); *Steger v. Franco,* 228 F.3d 889, 892 (8th Cir.2000) ("Although plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, they must at least prove knowledge of the barri-

ers and that they would visit the building in the imminent future but for those barriers.").

At a minimum, therefore, as to each owner/operator the association seeks to hold injunctively liable, at least one member of Access Today will have to come forward with evidence (1) that he or she is disabled, (2) that he or she has "actual notice" of the existence of an architectural barrier at a restaurant run by the owner/operator, and (3) that he or she would visit that restaurant in the future but for the architectural barrier. Depending upon how Access Today chooses to present such testimony, the litigation might require the involvement of many of its members or just a few of its members. The lesson of *Pennsylvania Psychiatric Society* is that Access Today should be given the opportunity, at this stage in the litigation, to attempt an approach that would limit the involvement of its members in the litigation by means of "sample testimony."

To be sure, Access Today's task may be complicated both by the difficulty in demonstrating "actual notice" of architectural barriers as to each owner/operator that it seeks to hold injunctively liable, as well as Plaintiffs' concession, *see* discussion *infra* Part II.E.5, that a disabled individual's standing to sue under Title III of the ADA is limited to barriers related to his or her own disability.[13] However, the Court is not prepared to rule on the face of the amended complaint that Plaintiffs' injunctive claims create insurmountable hurdles to the use of sample testimony as would preclude associational standing to Access Today.

*b.* *Access Today's Members' Standing to Sue for Injunctive Relief in Their Own Right*

Defendants also contend that Access Today lacks standing because it cannot satisfy the first prong of the *Hunt* test that its members would have standing to sue in their own right. In advancing this argument, Defendants incorporate by reference five discrete challenges that they have mounted to Clark's standing to sue individually. As explained *infra* Parts II.E.1–5, those challenges limit Clark's standing, but they do not defeat it; Clark enjoys standing to sue in his own right, but only as to architectural barriers relating to the disability of paraplegia at restaurants he visited in advance of filing the original complaint. The short answer to Defendants' present challenge, therefore, is that Clark's standing, albeit limited, enables Access Today to satisfy the first prong of the *Hunt* test. *See Warth,* 422 U.S. at 511, 95 S.Ct. 2197 ("The association must allege that its members, *or any one of them,* are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." (emphasis added)).

However, a longer answer is necessitated by Defendants' position, advanced in the alternative, that if Access Today enjoys standing by reference to allegations concerning its member Clark, then its standing is concomitantly limited so as to be coextensive with the standing Clark enjoys. (*See* Def. McDonald's Mem. Law Supp. Mot. Dismiss Am. Compl. at 14–15.) Access Today cannot advance the claims of its unidentified members, say the Defendants, because the amended complaint does not "identify [such members], allege which [members] have which disabilities, allege which [members] with which disabilities visited which store on which dates, identify what discriminatory conduct was encountered, [and] which stores each unnamed member plans to visit (if any)." (*Id.* at 16.)

The Court disagrees. Such exactitude has been described by the Third Circuit as an "exaggerated" pleading requirement as it re-

---

13. For example, even if it can be established by Clark's sample testimony, with respect to McDonald's locations in New Jersey and Southeastern Pennsylvania, that "[t]here is no visual or auditory alarm in [the] toilet room[s]," (Am. Compl.¶ 46(d)), that "[t]here are no raised Braille characters ... adjacent to the latch side of toilet room entry doors," (*id.* ¶ 46(k)), and that "[t]he telephone[s] do[ ] not have volume con-

trol," (id.¶ 46(x)), the Court would nevertheless lack authority to grant injunctive relief in favor of Access Today to cure such violations without the participation of visually– and auditorily-impaired members of the association willing to testify that they would visit the McDonald's locations in New Jersey and Southeastern Pennsylvania but for such architectural barriers.

lates to associational standing. *See Hosp. Council of W. Pa.*, 949 F.2d at 88. The kind of precision demanded by Defendants must await a "factual 12(b)(1) motion" challenging associational standing, *see, e.g., Med. Soc'y v. Herr*, 191 F.Supp.2d 574, 578–80 (D.N.J. 2002), or a like motion under Rule 56(b), *see, e.g., Doe v. Stincer*, 175 F.3d 879, 886–87 (11th Cir.1999). Access Today has satisfied its burden to plead associational standing on injunctive claims. Whether, on a going-forward basis, it will be able to satisfy its burden with "the manner and degree of evidence required at the successive stages of the litigation," or to prove that its claims are greater than those of Clark, are issues upon which the Court expresses no opinion.

## D. CLASS CERTIFICATION

Rule 23 of the Federal Rules of Civil Procedure provides, for purposes here relevant, as follows:

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The mat-

ters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**(c) Determination by Order Whether Class Action to be Maintained**; Notice; Judgment; Actions Conducted Partially as Class Actions.

. . . .

(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

. . . .

Fed.R.Civ.P. 23.

For the reasons set forth below, the Court shall enter an order (1) striking the amended complaint's prayer for certification of the Defendant Class on the grounds that if Rule 23(b)(2) ever permits the certification of a defendant class, then such certification is limited to circumstances, not applicable here, in which the defendants are alleged to have acted uniformly in furtherance of, or in adherence to, some illegal practice or policy; and (2) striking the amended complaint's prayer for certification of the Defendant Subclass on the dual grounds (a) that subdivisions (a)(3) and (a)(4) prohibit the maintenance of a Rule 23(b)(3) class action in damages against absent franchisees against

whom Clark enjoys no cause of action in his own right, and (b) that under subdivision (b)(3)(A), the maintenance of a 23(b)(3) defendant class would not be a superior method of adjudicating the controversy, given the interest of franchisees in the Subclass States of individually controlling the defense of separate actions against them.

### 1. A Rule 23(B)(2) Defendant Class Cannot Be Certified.

■ There is a significant split of opinion as to whether Rule 23(b)(2) ever permits injunctive relief against a defendant class. The Fourth and Seventh Circuits, together with the leading treatise on federal procedure, take the view that defendant classes are not authorized by Rule 23(b)(2). *Henson v. E. Lincoln T'ship*, 814 F.2d 410, 411–17 (7th Cir.1987); *Paxman v. Campbell*, 612 F.2d 848, 854 (4th Cir.1980) (en banc); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 & n. 17.1 (2d ed. 1986 & West Supp.2002). These authorities are generally of the view that the text of 23(b)(2) itself forbids defendant classes. An excerpt from *Paxman* states the position succinctly:

> As is clear from the language of the Rule, it is applicable to situations in which a class of plaintiffs seeks injunctive relief against a single defendant—the *party* opposing the class—who has acted on grounds generally applicable to the plaintiff class. To proceed under 23(b)(2) against a class of defendants would constitute the plaintiffs as "the party opposing the class," and would create the anomalous situation in which the plaintiffs' own ac-

tions or inactions could make injunctive relief against the defendants appropriate.

612 F.2d at 854 (emphasis original) (citation omitted).

On the other hand, the Second Circuit, together with the leading class action treatise, take the view that defendant classes are permitted by Rule 23(b)(2). *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (citing *Marcera v. Chinlund*, 595 F.2d 1231, 1237 (2d Cir.1979)); 1 Alba Conte, *Newberg on Class Actions* § 4.65 (3d ed.1992). The Sixth Circuit appears to agree that defendant classes are permissible under Rule 23(b), but only if individual defendants are all acting to enforce a locally administered state statute or uniform administrative policy. *See Thompson v. Bd. of Educ. of Romeo Community Sch.*, 709 F.2d 1200, 1203–04 (6th Cir.1983). The principal justification for permitting defendant classes under Rule 23(b)(2) seems to be that the device can be particularly useful to bind to a court decree a group of defendants who, out of recalcitrance or neglect, have refused to conform their conduct to settled substantive law, *see Henson*, 814 F.2d at 417–19 (*Campbell*, J., dissenting), or to eliminate the need for ancillary proceedings against a number of semi-autonomous defendants once the court has made a basic determination of legal issues applicable to all, *see* 1 Alba Conte, *Newberg on Class Actions* § 4.65 (3d ed.1992).

Although the Third Circuit has never addressed the propriety of a Rule 23(b)(2) defendant class, it has affirmed without discussion a district court's decision to certify one.[14]

14. The parties cite *Georgevich v. Strauss*, 772 F.2d 1078 (3d Cir.1985) (en banc), somewhat inaccurately, as a case in which the Third Circuit "affirmed" a district court's decision to certify a 23(b)(2) defendant class without addressing whether the rule permits such certification. Although it is true that the seven-judge *Georgevich* majority held that the Pennsylvania Common Pleas judges composing the defendant class, who had been sued in their capacity as enforcers of purportedly unconstitutional state parole procedures, were "proper parties" to the dispute, *id.* at 1087–89, that portion of the opinion did not implicitly "affirm" the certification of the defendant class, much less speak to the certification issue. Rather, the Circuit's *Georgevich* decision is properly read as addressing whether the

judges had the capacity to be sued under Pennsylvania law, *id.* at 1088 n. 10, whether they enjoyed Eleventh Amendment or judicial immunity from suit, *id.* at 1088–89, and whether they held a position sufficiently adverse to the plaintiffs, *id.* at 1087–88, and possessed institutional authority to redress the plaintiffs' grievances, *id.* at 1089, as would create a justiciable "case or controversy" under the Constitution. There is no reason to believe that these capacity, immunity, or justiciability issues either would have been absent, or would have been decided any differently, had the *Georgevich* plaintiffs sued a single judge instead of a class of judges.

Moreover, the district court opinion certifying the defendant class not only is unpublished, but

In *Pennsylvania v. Local Union 542*, 469 F.Supp. 329 (E.D.Pa.1978), a class of black workers brought suit against a construction workers' union, several construction industry trade associations, and 1400 construction industry employers, alleging race discrimination actionable under 42 U.S.C. § 1981 in the operation of the union's system of referring workers to construction industry employers who were signatories to a collective bargaining agreement that the trade associations had negotiated with the union. The complaint charged that the defendants had discriminated against black workers by denying them access to the union's referral lists and by arbitrarily skewing referrals in favor of white workers.

The district court certified a defendant class under Rule 23(b)(2) consisting of all trade associations and employers who had been parties to the labor contracts with the union. *See* 469 F.Supp. at 415–17. In doing so, it expressly rejected the notion that Rule 23(b)(2) did not permit defendant classes. The court reasoned that "where the litigable issues are identical or nearly so, the efficacy of proceeding by a defendant class action logically outweighs the arguments favoring multiple individual suits and fits tightly with the overall scheme of 23(b)(2)." *Id.* at 416.

On the merits, the district court found that the union's practices, in administering the referral system, constituted intentional racial discrimination in violation of § 1981. The court also found that the defendant class of trade associations and employers, though unaware of the union's intentional discrimination, could be held injunctively liable under a

respondeat superior theory, on account of their contractual relationship with the union and their use of its referral system. A remedial injunctive decree required the employers to meet detailed "minority utilization goals" in their hiring, to hire workers unaffiliated with the union if they were unable to meet the goals through union referrals, and to issue quarterly reports detailing the extent of their compliance with the court's directives. The district court also imposed on the trade associations and employers the financial cost of enforcing the decree.

On appeal, an equally divided en banc panel of the Third Circuit affirmed the judgment of the district court in a one-sentence per curiam opinion. *Pennsylvania v. Local Union 542*, 648 F.2d 923, 924 (3d Cir. 1981).[15] However, the Supreme Court granted certiorari and reversed, holding (1) that liability could not be imposed under § 1981 without proof of intentional discrimination, (2) that absent a finding of discriminatory intent on the part of the trade associations and employers, they could not be held vicariously liable based on the union's intentional discrimination, and (3) that the district court lacked authority to allocate to the trade associations and employers the costs of a remedial injunction. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Although the High Court never spoke to the propriety of defendant classes under Rule 23(b)(2), it addressed the district court's decision to certify the defendant class as follows:

would lack precedential value if it were published, given the Third Circuit disposition, *id.* at 1095, remanding the case to the district court with instructions to decline the exercise of federal subject matter jurisdiction on *Pullman* abstention grounds. *See Hoots v. Pennsylvania*, 672 F.2d 1124, 1131 n. 14 (3d Cir.1982) (Third Circuit order remanding case to district court with instructions to dismiss for lack of subject matter jurisdiction deprives prior district court decision of precedential value).

**15.** An "unexplained affirmance by an equally divided court [is] a judgment not entitled to precedential weight no matter what reasoning may have supported it." *Rutledge v. United States*, 517 U.S. 292, 304, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996); *see Am. Sterilizer Co. v. Sybron Corp.*,

526 F.2d 542, 547 (3d Cir.1975). Likewise, such affirmances ex necessitate—in which it cannot be known whether the appellate judges favoring affirmance would have adopted the reasoning of the court below—deprive the district court opinion itself of precedential value. *See United States v. Cerceda*, 172 F.3d 806, 811–12 & n. 6 (11th Cir.1999) (en banc) (per curiam); *see also United States v. Yarbrough*, 852 F.2d 1522, 1538 n. 8 (9th Cir.1988) ("Opinions which are affirmed by an equally divided en banc Court of Appeals have no precedential value."); *Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235, 1236 (8th Cir.1983) (en banc) ("The judgment of the district court in this case is affirmed by an equally divided court upon rehearing en banc. The judgment, accordingly, is without precedential value....").

Petitioners have raised several objections to the District Court's certification of a defendant class. In light of our disposition, however, we find it unnecessary to reach these issues. It is evident from the District Court's opinion that certification of the defendant class was premised on theories of liability that made individualized questions irrelevant. We have now rejected those theories, and we assume that the District Court will reconsider the issue of class certification in the event of a new trial to determine liability.

*Id.* at 402 n. 22, 102 S.Ct. 3141 (citation omitted); *see also id.* at 380 n. 5, 102 S.Ct. 3141.[16]

Aside from the *Georgevich* and *Local Union 542* decisions, the Court's research discloses just four occasions in which district courts within the Third Circuit have certified Rule 23(b)(2) defendant classes. In each instance, the members of the defendant class were alleged to have acted uniformly in furtherance of, or in adherence to, an illegal state practice or policy sought to be adjudged unconstitutional. First, in *Baksalary v. Smith*, 579 F.Supp. 218 (E.D.Pa.1984), a three-judge court certified a Rule 23(b)(2) defendant class in an action challenging the constitutionality of a provision of the Pennsylvania Workmen's Compensation Act. *Id.* at 220. The reasons for certifying the defendant class were never explained in *Baksalary*, because the court merely cited its prior unpublished decision granting defendant class certification. *Id.*

Second, in *Institutionalized Juveniles v. Secretary of Public Welfare*, 78 F.R.D. 413 (E.D.Pa.1978), an action challenging the constitutionality of Pennsylvania statutes and regulations governing the voluntary commitment of mentally ill and mentally retarded juveniles, a three-judge court certified a 23(b)(2) defendant class consisting of the directors of all mental health and retardation facilities in Pennsylvania subject to the challenged regulations, *id.* at 415, explaining that

the purpose of certification was "solely to ensure compliance with any decision regarding the validity of the statute and regulations which the class [would be] bound to implement." 568 F.Supp. 1020, 1023 (E.D.Pa. 1983).

On the merits, the district court held the statutes and regulations unconstitutional, *see* 459 F.Supp. 30 (E.D.Pa.1978), which judgment was reversed on direct appeal to the United States Supreme Court, *see Sec'y of Pub. Welfare v. Institutionalized Juveniles,* 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). Without speaking to the propriety of defendant classes under Rule 23(b)(2), the Supreme Court noted that the state had not contested the district court's definition of the defendant class. *Id.* at 642 n. 1, 99 S.Ct. 2523. On remand, the district court entered judgment in favor of the defendants without "reach[ing] the question of the propriety of continuing to maintain the defendant class." 87 F.R.D. 463, 464 n. 2, 465 (E.D.Pa.1980).

Third, in *Gibbs v. Titelman,* 369 F.Supp. 38 (E.D.Pa.1973), the court certified a defendant class in an action challenging the constitutionality of Pennsylvania Motor Vehicle Sales Finance Act provisions permitting repossession of motor vehicles pursuant to conditional sales contracts. *Id.* at 50–53. The court rejected the notion that Rule 23(b)(2) prohibited a defendant class in the case before it:

It is presumed by the Court that the rationale behind [the] interpretation of [Rule 23(b)(2) as forbidding defendant classes] is ... that the less-stringent notice requirements of Rule 23(b)(2), as opposed to Rule 23(b)(3), could cause an unwary member of a defendants' class to be prejudiced if an injunction is entered against him. However, in the case at hand, where the outcome will result solely in a declaration on the constitutionality of certain statutes, there is no possibility of prejudice. The relief

---

**16.** Following the Supreme Court's decision, the *Local Union 542* plaintiffs apparently abandoned their attempt to maintain the lawsuit as a defendant class action against the trade associations and employers. On remand, the plaintiffs instead sought to amend their complaint to join the trade associations and employers as individual defendants, which motion was denied by the district court. *See Pennsylvania v. Local 542,* Civ. A. No. 71–2698, 1983 WL 715 (E.D.Pa. Aug.8, 1983).

sought here is really against the statute, not the defendants.

*Id.* at 53. On the merits, the court adjudged the statute unconstitutional, *id.* at 58–59, which judgment was reversed by the Third Circuit with instructions to dismiss the complaint for failure to state a claim upon which relief could be granted. 502 F.2d 1107, 1115 (3d Cir.1974). The Third Circuit remained silent as to the propriety of certifying a defendant class under Rule 23(b)(2).

Finally, in *Samuel v. University of Pittsburgh,* 56 F.R.D. 435 (W.D.Pa.1972), an action brought to declare unconstitutional a state rule governing the determination of student Pennsylvania resident status, the court certified a 23(b)(2) defendant class consisting of "basically all the state universities and colleges of Pennsylvania," *id.* at 438–39, but immediately dismissed the claims made against this class on the grounds that the named plaintiffs, who were not students at such schools, lacked standing to sue any of the defendant class members, *id.* at 440.[17]

A review of the foregoing district court decisions reveals that the certification of 23(b)(2) defendant classes has been implemented only tepidly in the Third Circuit, and has met success, if at all, only in cases where

the individual defendants of the class are alleged to be acting in conformity with an illegal state statute, rule, or regulation. The case before the Court presents the opposite situation, in which the individual defendants of the proposed class are alleged to be disobeying valid governmental policies. Moreover, the amended complaint makes sufficiently clear that the individual members of the defendant class have been non-uniform in their non-compliance with such policies (or at least that Plaintiffs cannot, consistent with Rule 11, allege that the members of the defendant class have been uniform in their non-compliance with such policies). Of the twenty-six architectural barriers listed in the amended complaint, (Am.Compl.¶ 46(a)-(z)), Plaintiffs state that they do not know, and seek discovery to determine, "which ADA violations are applicable to which particular McDonald's brand restaurants," (*id.* ¶ 47).

Under these circumstances, the Court need not subscribe to the Defendants' view that Rule 23(b)(2) never permits defendant classes. *Cf. Henson,* 814 F.2d at 411–17. It is enough to conclude that if Rule 23(b)(2) ever permits such certifications, then they are confined at least to those situations—not applicable here—in which individual mem-

---

**17.** In contrast to *Georgevich, Local Union No. 542, Baksalary, Institutionalized Juveniles, Gibbs* and *Samuel,* other district courts within the Third Circuit have declined to certify defendant classes under Rule 23(b)(2). In general, however, these decisions do not appear to be based on the belief that defendant classes are impermissible under 23(b)(2), but rather on the failure of the defendant class to meet the prerequisites for class certification in each case. *See O'Connell v. David,* 35 B.R. 146, 149 (E.D.Pa.1983) (declining to certify 23(b)(2) defendant class in an action to enjoin the unauthorized practice of law, where no evidence was presented to suggest that the named representatives of the defendant class could provide fair and adequate representation to class members), *aff'd mem.,* 740 F.2d 958 (3d Cir.1984); *In re Arthur Treacher's Franchise Litig.,* 93 F.R.D. 590, 594 (E.D.Pa.1982) (declining to certify 23(b)(2) defendant class in action to recover royalty payments under contracts with fast food franchisees, where the predominant form of relief sought was not injunctive in nature, but money damages); *Osborn v. Pa.—Del. Serv. Station Dealers Ass'n,* 94 F.R.D. 23, 26 n. 2 (D.Del.1981) (declining to certify 23(b)(2) defendant class in consumer action against service stations alleged to have boycotted gasoline sales to the public with the intention of forcing the

Department of Energy to raise the maximum retail price of gasoline, where the predominant form of relief sought was not injunctive in nature, but money damages); *Manning v. Princeton Consumer Discount Co.,* 390 F.Supp. 320, 324 (E.D.Pa.1975) (declining to certify defendant car dealer as representative of putative class of sellers who violated federal Truth–In–Lending Act provision where plaintiff failed to substantiate her allegation that there was an industry-wide practice of violating such provision), *aff'd,* 533 F.2d 102, 104 (3d Cir.1976); *Rice v. City of Phila.,* 66 F.R.D. 17, 21–22 (E.D.Pa.1974) (declining to certify 23(b)(2) defendant class of Philadelphia judges where members of putative class likely enjoyed immunity, did not meet numerosity requirement, and grant of relief as against the named judge would, as a practical matter, have the same effect as granting relief as against the proposed class). On the other hand, at least one district court in this Circuit has recognized the split in authority concerning the propriety of defendant classes under Rule 23(b)(2) and declined to "impos[e] the controversial class action device on a reluctant class" absent the necessity to do so. *Flying Tiger Line, Inc. v. Cent. States, Southwest & Southeast Areas Pension Fund,* Civ. A. No. 86–304, 1986 WL 13366, at *4–5 (D.Del. Nov.20, 1986).

bers of the defendant class are all acting in furtherance of, or pursuant to, some uniform practice or policy, cf. *Thompson v. Bd. of Educ.,* 709 F.2d 1200, 1203–04 (6th Cir.1983); *Manning v. Princeton Consumer Discount Co.,* 390 F.Supp. 320, 324 (E.D.Pa.1975), *aff'd,* 533 F.2d 102, 104 (3d Cir.1976), or where the applicable theory of law otherwise renders individualized questions irrelevant to the determination of class-wide injunctive liability, cf. *Gen. Bldg. Contractors Ass'n,* 458 U.S. at 380 n. 5, 402 n. 22, 102 S.Ct. 3141.

Had plaintiffs alleged, for example, that McDonald's and its franchisees adhered to a company-wide policy of providing just one handicapped parking space in restaurant parking lots, or of installing no "grab bars" in restaurant toilet stalls, then one could imagine why injunctive relief—against the defendants as a class—might be appropriate to redress such violations. Cf. *Colo. Cross-Disability Coalition v. Taco Bell Corp.,* 184 F.R.D. 354 (D.Colo.1999) (certifying plaintiff class under Rule 23(b)(2) in Title III ADA case involving same "queue line" architectural barrier at all of defendant's restaurants located within Colorado). But the allegations of the amended complaint, as well as Plaintiffs' theories of injunctive liability, make clear that individualized determinations need to be made as to which ADA violations exist at which McDonald's restaurants, a situation in which a class-wide finding of injunctive liability would hardly be appropriate. If Rule 23(b)(2) permits the maintenance of defendant classes in some cases, this is not one of them. Plaintiffs' prayer for certification of the Defendant Class shall be stricken.

### 2. A RULE 23(B)(3) DEFENDANT SUBCLASS CANNOT BE CERTIFIED.

There are two equally compelling grounds for concluding that the Rule 23(b)(3) Defen-

dant Subclass proposed by Plaintiffs likewise cannot be certified. First, the "typicality" requirement of Rule 23(a)(3) prohibits the maintenance by Plaintiff Clark of a Rule 23(b)(3) class action in damages against franchisees against whom he enjoys no cause of action in his own right.[18] Second, under Rule 23(b)(3)(A), the maintenance of a 23(b)(3) Defendant Subclass would be an inferior method of adjudicating the controversy, given the interest of franchisees in the Subclass States of individually controlling the defense of separate actions against them.

#### a. Rule 23(a)(3) Prohibits Certification of the Proposed Defendant Subclass.

In concluding that the proposed Defendant Subclass for damages claims could never be certified under Rule 23(b)(3), the Court is guided by *Haas v. Pittsburgh National Bank,* 526 F.2d 1083 (3d Cir.1975), and its progenitor, *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973). In *La Mar,* the named plaintiff initiated an action against all Oregon-licensed pawn brokers on behalf of all customers of such pawn brokers to recover penalties for the defendants' alleged violations of the federal Truth–In–Lending Act, although La Mar, the putative class representative, had only borrowed money from the first-named defendant, H & B Novelty & Loan Co. ("H & B"). 55 F.R.D. 22, 23 (D.Or.1972). Initially, the district court ruled that La Mar could only represent a class of persons who, like him, had borrowed money from H & B. *Id.* at 23. This ruling was not challenged on appeal. However, the district court later determined that La Mar could also represent, under Rule 23(b)(3), "all borrowers who dealt with Oregon pawnbrokers other than the broker from whom plaintiff, himself, borrowed." *Id.* at 24.

---

**18.** Because Plaintiffs concede that Access Today does not seek, on its own behalf, money damages for injuries traceable to the conduct of the Defendants, *see* discussion *supra* note 4, and because Access Today lacks associational standing to press claims for damages running to the benefit of its members, *see* discussion *supra* Part II.C.1, Access Today cannot serve as a representative of a Plaintiff Subclass seeking damages. *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,* 209

F.R.D. 323, 339 (S.D.N.Y.2002) ("Plaintiffs fail to cite, and this Court cannot find, any authority for the proposition that absent class members with [damages] claims can be adequately represented by class representatives seeking only injunctive relief."); *see also Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3d Cir.1987) ("It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim.").

On a certified interlocutory appeal, *see id.* at 25–26, the Ninth Circuit reversed the district court's "determination that La Mar's action was a proper class action with respect to those pawn brokers with whom he had no dealings," and directed that La Mar's action be dismissed as to such defendants. 489 F.2d at 462–63. The appellate panel observed that La Mar "was injured by a method of dealing more or less common to all defendants," *id.* at 464, but found that such similarity was not enough to enable La Mar to represent absent plaintiffs who transacted business with pawnbrokers other than H & B. The court synopsized its holding as follows:

The . . . issue [in this] case[ ] is whether a plaintiff having a cause of action against a single defendant can institute a class action against the single defendant and an unrelated group of defendants who have engaged in conduct closely similar to that of the single defendant on behalf of all those injured by all the defendants sought to be included in the defendant class. We hold that he cannot. Under proper circumstances, the plaintiff may represent all those suffering an injury similar to his own inflicted by the defendant responsible for the plaintiff's injury, but in our view he cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury.

*Id.* at 462.

Although much of the Ninth Circuit's language is couched in terms evocative of the injury-in-fact requirement of Article III standing, the appellate panel explicitly assumed that La Mar enjoyed standing. *Id.* at 464. Rather, the Ninth Circuit's decision turned on the question of whether Rule 23 permitted the class certification at issue. *Id.* In reversing the district court's decision, the Ninth Circuit concluded, as a matter of law, that the class certification at issue flunked the "typicality" and "adequacy of representation" requirements of Rules 23(a)(3) and 23(a)(4), respectively.[19]

Regarding Rule 23(a)(3) typicality, the Ninth Circuit stated:

Obviously, [the typicality] requirement is not met when the 'representative' plaintiff never had a claim of any type against any defendant. There is nothing in the rule to suggest that the zeal or talent of the 'representative' plaintiff's attorney can supply this omission. We believe that this prerequisite is also lacking when the plaintiff's cause of action, although similar to that of other members of the class, is against a defendant with respect to whom the class members have no cause of action.

*Id.* at 465.

Regarding Rule 23(a)(4) adequacy-of-representation, the Ninth Circuit stated:

In keeping with [the] tone [of "prudence and caution" of the Advisory Committee Note to Rule 23] and to reduce the incidence of proceedings in which the trial judge and the representative plaintiff's counsel become a part-time regulatory agency, we assert that a plaintiff who has no cause of action against the defendant can not 'fairly and adequately protect the interests' of those who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant and even though his attorney is excellent in every material respect.

*Id.* at 466.[20]

Although *La Mar* is not controlling authority outside the Ninth Circuit, its significance here was established on an appeal to the Third Circuit from the district court's judgment in *Haas v. Pittsburgh National Bank,* 381 F.Supp. 801 (W.D.Pa.1974). In *Haas,*

---

**19.** The Ninth Circuit also concluded as a matter of law that the "superiority" requirement of Rule 23(b)(3) could not be satisfied. 489 F.2d at 467–68.

**20.** The Ninth Circuit went on to note two exceptions to its holding: "Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury. Nor is it intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *La Mar,* 489 F.2d at 466 (footnotes omitted).

the district court-like the Oregon federal court reversed in *La Mar*—had certified a plaintiff class in an action against multiple defendants, some of whom had never transacted business with the representative plaintiff, but who were all alleged to have acted with respect to unnamed members of the plaintiff class in the same fashion as did the particular defendant against whom the representative plaintiff enjoyed a cause of action in her own right. *See* 60 F.R.D. 604, 611–14 (W.D.Pa.1973).

However, approximately six months thereafter the district court reconsidered its class certification decision based on the Ninth Circuit's intervening decision in *La Mar*. *See* 526 F.2d at 1095. It concluded that class certification had been improper as against a particular defendant, Equibank, with whom the representative plaintiff had never conducted business, and ordered that summary judgment would be entered in favor of Equibank unless the plaintiff amended her complaint to add as a party a nominal plaintiff who had conducted business with that defendant. *Id.* Although a second nominal plaintiff was promptly added in accordance with the district court's decision, the court nevertheless granted summary judgment in favor of Equibank on limitations grounds, holding, implicitly, that the amendment adding the second plaintiff did not relate back to the filing of the original complaint. *See* 381 F.Supp. at 807–08.

On appeal, the Third Circuit reversed the grant of summary judgment in favor of Equibank, holding that the district court had erred in failing to toll the limitations period with respect to members of the class that the original plaintiff purported to (but, pursuant to *La Mar*, could not) represent. 526 F.2d at 1096–98. In reaching its holding, however—and significant for present purposes—the appellate panel explained that the district court's antecedent decision ordering the ad-

dition of the second nominal plaintiff based upon the principles articulated in *La Mar* was proper:

> We believe that, where no nominal plaintiff has standing on any issue against one of multiple defendants, a suit for damages may not be maintained as a class action against that defendant. The district court, therefore, properly ordered the entry of summary judgment ... unless an appropriate nominal plaintiff was added.

*Id.* at 1095–96 (footnote omitted). The Third Circuit observed that there were "certain exceptions to [the] rule" just announced, and cited *La Mar* with approval as having

> properly excluded (1) situations in which the injuries are a result of 'a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury,' or (2) instances in which all defendants are juridically related and a single disposition of the entire dispute would be expeditious.

*Id.* at 1095 n. 15 (quoting *La Mar*, 489 F.2d at 466).

■ When the rule of *Haas* and *La Mar* is applied to the case at bar,[21] it compels the conclusion that Clark cannot maintain a 23(b)(3) damages action on behalf of a plaintiff class against a particular McDonald's franchisee at whose hands Clark suffered no injury, no matter how similar Clark's injury is to those of the absent class members he hopes to represent. The next logical question is whether this prohibition is in any way affected by the fact that Clark—unlike the nominal plaintiffs in *Haas* and *La Mar*—has attempted to sue a class of defendants. The answer is no; the limits imposed by *Haas* and *La Mar* apply not only when multiple defendants are sued individually, but also when multiple defendants are sued as members of a class. *See In re Itel Securities Litig.*, 89 F.R.D. 104, 119 (N.D.Cal.1981) ("Although the question has received little discussion, the rules of *La Mar* apparently

**21.** The facts alleged by Plaintiffs fit neither exception to the rule. Plaintiffs do not allege any concert of action on the part of the putative members of the Defendant Subclass as might suffice to trigger the "conspiracy or concerted scheme" exception. Nor do the circumstances of this case satisfy the "juridical relationship" exception, which in broad terms applies to "de-

fendant classes whose conduct is standardized by a common link to an agreement, contract or enforced system which acts to standardize the factual underpinnings of the claims and to insure the assertion of defenses common to the class." *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 77 (S.D.N.Y.1986).

should be applied to defendant class certifications."); *see, e.g., Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74–77 (S.D.N.Y. 1986) (granting defendant's motion to dismiss complaint's class action allegations with respect to proposed defendant class where named plaintiff could not satisfy *La Mar* rule on "typicality" or "adequacy of representation"); *Ellis v. O'Hara*, 105 F.R.D. 556, 563 (E.D.Mo.1985) (denying motion to certify defendant class for want of "typicality" where the named plaintiffs had not asserted a claim in their own right against each member of the putative defendant class) (citing *La Mar*); *Mudd v. Busse*, 68 F.R.D. 522, 527–28 (N.D.Ind.1975) (denying motion to certify defendant class for want of "typicality" where plaintiffs could not satisfy the "juridical link" exception to the *La Mar* rule); *cf., e.g., Marchwinski v. Oliver Tyrone Corp.*, 81 F.R.D. 487, 489 (W.D.Pa.1979) (permitting discovery on the question of certification of defendant class action after finding it likely that the "juridical link" exception to *Haas* would be met).

Because the proposed Defendant Subclass has been framed in such a way as to include members as to whom it is obvious that nominal plaintiff Clark enjoys no cause of action in his own right, in contravention of *Haas* and *La Mar*, it is inevitable that the Defendant Subclass will not be certified under Rule 23(b)(3).[22] Accordingly, the Court shall strike the amended complaint's prayer for certification of the Defendant Subclass.

> *b.* *Rule 23(c)(2)'s "Opt Out" Provision Renders the Proposed 23(b)(3) Defendant Subclass an Inferior Method of Adjudicating the Controversy.*

The prayer for certification of the Defendant Subclass shall also be stricken on the grounds that the "opt out" of defendant class members permitted under subdivision (c)(2) of the Rule would render the certification of a damages subclass under subdivision (b)(3) a futile exercise. This "opt out" problem is properly conceptualized as a consideration relevant to whether the class action device meets the "superiority" requirement of subdivision (b)(3), in particular subdivision (b)(3)(A)'s direction that the Court consider "the interest of members of the class in individually controlling the . . . defense of separate actions."[23] Stated differently, "[t]he requirement of Rule 23(b)(3)(A) . . .

---

**22.** It may seem strange that certification of a *defendant* class could be denied based on the failure of the named plaintiff to satisfy the "typicality" or "adequacy-of-representation" requirements relative to the maintenance of a *plaintiff* class. But that is just a function of the rule set forth in *Haas* and *La Mar* limiting the propriety of a plaintiff class action by reference to the particular defendants against whom it is sought to be maintained. Moreover, in a bilateral class action, the definitions of the plaintiff and defendant classes will reflect opposite sides of the same coin. *See, e.g., Mudd*, 68 F.R.D. at 530–31 (in putative bilateral class action, where the court denied defendant class certification on the grounds that the nominal plaintiff enjoyed a cause of action only against the nominal defendant and not against the members of the putative defendant class, the court found it "necessary to redefine the appropriate plaintiff class as well" to include only those plaintiff class members who had been injured by the named defendant); *Heffler v. U.S. Fid. & Guar. Ins. Co.*, Civ. A. No. 90–7126, 1992 WL 50095 at *6 (E.D.Pa. Mar.10, 1992) (in putative bilateral class action, court denied defendant class certification on the grounds that the nominal defendant was neither typical nor an adequate class representative, plaintiff class would be narrowed to include only those class members who had been injured by the nominal defendant).

**23.** Although the "opt out" problem identified by Defendants addresses just one of the four "superiority" considerations made pertinent by subdivisions (b)(3)(A)-(D), it has been observed that subdivision (b)(3)(A) takes on special significance in the context of a proposed defendant class:

> Several courts have held that the interest the individual members might have in controlling the defense or prosecution of separate suits is not important, if as a practical matter multiple actions would not be feasible. . . . *On the other hand, if an action involves a defendant class, the court must give considerable weight to any interest, theoretical or practical, that the individual class members might have in controlling their own defenses.* This caution recognizes the risks that inhere in plaintiff's choice of representatives for a defendant class and is in keeping with notions of procedural fairness and due process.

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1780 (2d ed.1986) (footnote omitted) (emphasis added). *Compare* Fed.R.Civ.P. 23(b) 1966 Advisory Committee Note ("The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action

focus[es] on the likelihood that unnamed class members will opt out of the litigation, thus frustrating the conservation of judicial resources justifying the class action in the first place." *Fleet v. U.S. Consumer Council, Inc. (In re Fleet),* 76 B.R. 1001, 1011–12 (Bankr.E.D.Pa.1987) (citing 3B James Wm. Moore et al. *Moore's Federal Practice* ¶ 23.45 (2d ed.1987)); *see, e.g., Abed v. A.H. Robins Co. (In re N. Dist. of Cal. Dalkon Shield IUD Prod. Liab. Litig.),* 693 F.2d 847, 856 (9th Cir.1982) (vacating certification of 23(b)(3) class for want of superiority where, inter alia, Rule 23(b)(3)(A) analysis indicated that class members had "a strong interest in controlling the prosecution of separate actions" and class members' attorneys had represented to the court that they would recommend that their clients opt out of the class).

The possibility of a mass opt-out is a real one. To the Court's research, every district court in this Circuit to deny certification of a Rule 23(b)(3) defendant class has done so in whole or in part because of the prospect that individual members of the defendant class would opt out of the litigation. *See Heffler,* 1992 WL 50095, at *5 (declining to certify Rule 23(b)(3) defendant class where, inter alia, there was an "extreme likelihood" that all members of the putative class would opt out); *Flying Tiger Line, Inc. v. Cent. States, Southwest & Southeast Areas Pension Fund,* Civ. A. No. 86–304, 1986 WL 13366 at *5 n. 10 (D.Del. Nov.20, 1986) ("While the Court is reluctant to certify a 23(b)(2) class because defendants will not be able to opt out, certification of a 23(b)(3) class suffers from the opposite problem. Because a 23(b)(3) class must allow the unnamed members to opt out, such certification would most likely prove to be of little value to plaintiffs."); *In re Arthur Treacher's Franchise Litig.,* 93 F.R.D. 590, 595–96 (E.D.Pa.1982) ("The Court completely agrees with defendants' argument that the proposed defendant-class members would undoubtedly opt out of the class thus rendering a(b)(3) certification, even if otherwise appropriate, a pointless judicial exercise.... It would be patently unrealistic to assume that any of the proposed [franchisee] class members, given the amounts of money [at issue] and their probable and natural desire to de-

fend any action in their own respective forums, would voluntarily elect to become a defendant in the class action sought to be maintained here.").

In the rare circumstance where a district court has certified a Rule 23(b)(3) defendant class notwithstanding the "opt out" possibility, it has been because the court found little incentive for the defendant class members to opt out. For example, in *Northwestern National Bank v. Fox & Co.,* 102 F.R.D. 507 (S.D.N.Y.1984), the court certified a defendant class consisting of each of the members of a partnership under circumstances where (1) the partners were subject to joint and several liability on the damages claims such that the nominal partner defendants had "interests and potential liabilities identical" to the absent class members and the latter could "collectively *minimize* their exposure by remaining in the class and assuming that any judgment against them is also available against the other partners with whom they share responsibility," and (2) the plaintiffs were prepared, in the event any partner opted out of the class, to join that partner individually. *Id.* at 514–15 (emphasis original).

In this case, the "opt out" issue boils down to whether each particular McDonald's franchisee in one of the Subclass States would have an incentive, given its potential liability in damages under its home state's disability anti-discrimination law, to permit Ygraine, an involuntary representative chosen by Plaintiffs, to defend it in a federal district court in New Jersey in the context of a massive class action, or conversely, would the franchisee have such an interest in controlling the course of the litigation against it as to opt out of such a proceeding? To ask the question is practically to answer it.

Unlike the *Fox* case, there would seem to be no prospect of joint and several liability amongst the members of the putative defendant class as would counsel in favor of a collective approach to minimize exposure. Nor have Plaintiffs threatened to attempt the individual joinder of a franchisee who opted out of a certified 23(b)(3) Defendant Subclass; instead, Plaintiffs claim that the

through representatives would be quite unobjectionable, or the amounts at stake for individuals

may be so small that separate suits would be impracticable.").

absence of class certification will force them "to sue state by state, or if need be, restaurant by restaurant," (Pls.' Mem. Law Opp'n Def.'s Mot. Dismiss Am. Compl. at 16–17), a procedure which the absent franchisees would almost certainly prefer to the class action proposed here, especially if individualized defenses would be available to the franchisees as a matter of state law.[24] However, assuming Plaintiffs' theory that Title III ADA violations constitute per se violations of the anti-discrimination laws of the Subclass States, individualized defenses would still be available to franchisees based upon differing architecture at different franchised restaurants, as well as the different legal standards applicable to existing facilities, *see id.* 28 C.F.R. § 36.104 (2002) (defining "readily achievable"), altered facilities, *see id.* § 36.402(c) (defining "to the maximum extent feasible"), and new facilities, *see id.* § 36.401(c) (defining "structural impracticability"), owned by different franchisees. Under these circumstances, the Court cannot envision that absent franchisees would not opt out of a certified 23(b)(3) Defendant Subclass en masse.

### 3. PLAINTIFFS' PRAYER FOR CERTIFICATION OF PLAINTIFF CLASSES SHALL NOT BE STRICKEN ON THE BASIS OF THE AMENDED PLEADING.

The Court's determination that the Defendant Class and Defendant Subclass cannot be certified necessarily delimits the scope of any putative Plaintiff Class or Plaintiff Subclass to include only plaintiffs who have been injured by Defendants McDonald's and Ygraine. The next question is whether the amended complaint itself demonstrates the impossibility of certifying these more tailored putative plaintiff classes. Injunctive plaintiff classes certified under 23(b)(2) have been maintained in several Title III cases. *See Ass'n for Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 461–62 (S.D.Fla.2002) (citing cases). Similarly, the Court cannot say at this juncture that it would be impossible for a damages class to be certified under 23(b)(3), especially if limited to discrete issues of liability, or if sub-classing is employed. *See* Fed.R.Civ.P. 23(c)(4). If there is some insurmountable impediment to the maintenance of plaintiff classes discernible from the face of the amended complaint, the Court does not see it, and it is expected in any case that the accompanying Order requiring particularization from Plaintiffs will have the effect of narrowing the scope of the lawsuit in such a way that the nature of the proposed plaintiff class certifications will change and that the Court will not become the nationwide building court for McDonald's restaurants.[25]

### E. STANDING OF CLARK

Defendants advance five arguments as to why Plaintiff Clark lacks standing individually. They are addressed in turn.

---

**24.** Defendants have pointed out that the ADA authorizes the Attorney General of the United States, upon application by a state or local government, to certify that a state or local law establishes requirements meeting or exceeding the minimum requirements of Title III. *See* 42 U.S.C. 12188(b)(1)(A)(ii). Further, the Attorney General's certification would constitute rebuttable evidence that a McDonald's restaurant constructed or altered in compliance with the state or local law complied with the requirements of the ADA. *Id.* Although an evidentiary defense might thus be available to particular franchisees located in "certified" state or local jurisdictions, the Attorney General has only certified four such jurisdictions since passage of the ADA, none of which would affect Plaintiffs' damages claims arising under the laws of the Subclass States. *See* 63 Fed.Reg. 31,523 (1998) (certifying Florida Americans with Disabilities Accessibility Implementation Act); 63 Fed.Reg. 259 (1998) (certifying Maine Human Rights Act); 61 Fed.Reg. 51,719 (1996) (certifying Texas Accessibility Standards); 60 Fed.Reg. 16,887 (1995) (certifying Washington State Regulations for Barrier Free Design).

**25.** At oral argument, counsel for McDonald's took the position that the Plaintiff Class is unnecessary because when an individual plaintiff sues under the ADA as to architectural barriers, he or she "gets relief for the entire group of people who have the same disability who visit [the offending] restaurant." (Tr. Oral Arg. of 1/28/03 at 5:10–19.) This "lack of need" or "necessity doctrine" approach to Rule 23(b)(2), *see generally* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1785.2 (2d ed.1986); *see, e.g., Access Now, Inc. v. Walt Disney World Co.*, 211 F.R.D. 452, 455 (M.D.Fla. 2001), is unsettled in this Circuit, *see Bacal v. Southeastern Pa. Transp. Auth.*, No. Civ. A. 94–6497, 1995 WL 299029, at *5–6 (E.D.Pa. May 16, 1995), and because it has not been briefed by the parties, the Court does not here address its merits.

### 1. CLARK'S STANDING AS TO RESTAURANTS HE VISITED AFTER THE FILING OF PLAINTIFFS' ORIGINAL COMPLAINT

 First, Defendants invoke the principle that a party's standing is determined by the facts of the case as they existed at the time the lawsuit was filed. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Cleveland Branch NAACP v. City of Parma,* 263 F.3d 513, 524–26 & n. 11 (6th Cir.2001), *cert. denied,* 535 U.S. 971, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002); *Schiaffo v. Helstoski,* 492 F.2d 413, 424 (3d Cir.1974). Observing that the amended complaint identifies many more restaurants than the original complaint, Defendants contend that Clark must allege that his visits to these restaurants pre-date the filing of his original complaint in order to establish his standing to sue to make them ADA-compliant.

Plaintiffs admit that "Clark visited a number of restaurants both prior to and after he and [Access Today] filed their original complaint," but argue that "[t]he timing of Clark's visits cannot be considered a real barrier to relief, as any perceived deficiency in the pleadings on this issue would be immediately cured by a voluntary dismissal and refiling." (Pls.' Mem. Law Opp'n Def.'s Mot. Dismiss Am. Compl. at 4 n. 2.) The problem with Plaintiffs' argument is that it does not present a defense to a defective pleading; it only highlights a remedy that Plaintiffs have failed to pursue. Another remedy unpursued would have been to obtain leave to serve and file a supplemental complaint that cured defective allegations as to standing by pleading facts occurring subsequent to Plaintiffs' original filing. *See* Fed.R.Civ.P. 15(d); *Travelers Ins. Co. v. 633 Third Associates,* 973 F.2d 82, 87–88 (2d Cir.1992); *cf. Newark Branch NAACP v. City of Clifton,* Civ. A. No. 89–3238, 1990 WL 238665, at *5 (D.N.J. Dec.27, 1990).

The amended complaint leaves to conjecture whether *any* of the restaurants identified therein were visited prior to the filing of the original complaint, and Plaintiffs' admission that some were not precludes the Court from assuming otherwise. On the other hand, Plaintiffs' counsel has represented that Clark indeed visited "a number" of McDonald's restaurants prior to filing the original complaint. Although this representation does not cure any defect in the amended pleading, it does persuade the Court not to dismiss it outright. Instead, the Court shall exercise its discretion to require Plaintiffs to go beyond general allegations in the amended complaint to set forth particularized facts, by way of further amendment, supporting their contention, germane to the standing of both nominal plaintiffs, that Clark encountered architectural barriers at the McDonald's restaurants identified in the amended complaint in advance of filing the original pleading. *See Newark Branch NAACP v. Town of Harrison,* 907 F.2d at 1415 & n. 10. The accompanying Order will identify what particularized facts are necessary to avoid dismissal at this juncture.

### 2. CLARK'S STANDING AS TO RESTAURANTS HE VISITED AS A "TESTER"

 Defendants' second challenge to Clark's standing is that Clark has not alleged which restaurants he visited as a "patron" as opposed to a "tester." Defendants contend that the "subjected to discrimination" language of Title III's private enforcement provision provides a remedy only to bona fide patrons of public accommodations, because "under no construction of the ... law can a 'tester' who visits a public accommodation for the purposes of checking ADA compliance be considered 'subjected to discrimination.'" (Def. McDonald's Mem. Law Supp. Mot. Dismiss Am. Compl. at 10.)

The Court does not reach this argument for a simple reason: there is no basis in the amended complaint to assume that Clark's sole motivation, in visiting any McDonald's restaurant, was to test the Defendants' ADA compliance. Defendants' assertion to the contrary is based upon their own speculation that "[i]t is highly unlikely that [Clark] visited all of [the] stores as a patron before this suit was filed, given ... the distances from his Pennsylvania home, the number and geographic dispersal of the sites, and the fact that it is unlikely that he kept patronizing

McDonald's when, he alleges, all of them discriminate against the disabled." (*Id.* at 8.) If anything, the amended complaint suggests that Clark visited each McDonald's restaurant with the dual motivation of availing himself of goods and services *and* verifying ADA compliance, (*see* Am. Compl. ¶ 12), a situation in which Clark would still be a bona fide "patron."

### 3. CLARK'S STANDING TO SEEK INJUNCTIVE RELIEF TO CURE OR REMOVE ARCHITECTURAL BARRIERS ABSENT AN "IMMINENT INTENT" TO RETURN TO DEFENDANTS' RESTAURANTS

▇ Defendants' third challenge involves Clark's allegation in the amended complaint of his future intent to return to the McDonald's restaurants he has visited "[u]pon remediation" to avail himself of the goods and services there. (Am. Compl. ¶ 11; *see also id.* ¶ 51.) According to Defendants, Clark's allegation that he will return to the restaurants he has visited only when their architectural barriers are removed or cured is an insufficient allegation of the "imminence" necessary to seek injunctive relief. This line of reasoning was crystallized at oral argument in an exchange with McDonald's counsel:

THE COURT: You don't think it's sufficient to plead that [Clark] will return once the barriers or the problem is fixed?

MR. SHAPIRO: No, your honor. And here's why.... ... [Clark] alleges that he will not return unless and until those restaurants are remediated and this indefinite intent to return some day not knowing when it will be, does not satisfy the requirement of an imminent intent to return. Moreover, by—

THE COURT: Why should he be forced to re-suffer the same discrimination?

MR. SHAPIRO: He's not forced to.

THE COURT: Well, he would be forced to if you're going to make him go back, an intent to go back while it's still not in compliance with [the] ADA.

MR. SHAPIRO: The point of an injunction and the point of standing to obtain an injunction is that harm to the plaintiff is imminent, [and] unless enjoined, he will be harmed.

THE COURT: But isn't it imminent in the sense that if he were to go, he would suffer discrimination?

MR. SHAPIRO: It's not imminent because he says he's not going to go until after it's remediated, by which point, by definition, there will be no need for an injunction and he will not be harmed. So by pleading that[ ] he will not go unless and until the restaurant has been remediated, he does two things.

Number one, he says "I'm not going imminently, I don't know when I'm going to go. Some day in the future when they fix it I'll go."

And number two, he says "[W]hen I go, I won't have standing to seek an injunction because by definition I won't go until it's fixed." So, his pleadings indicate that he has no standing to seek an injunction.

(Tr. Oral Arg. of 1/28/03 at 13:3–14:12.)

The Court cannot agree with Defendants' argument. By characterizing Clark's intent to return to McDonald's restaurants as an intent to return "some day" in future, Defendants ostensibly rely on *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In *Defenders of Wildlife*, the Supreme Court was faced with a challenge by an associational plaintiff to the Secretary of the Interior's interpretation of the Endangered Species Act of 1973 as being limited in geographic reach to exclude foreign nations. *Id.* at 558–59, 112 S.Ct. 2130. To demonstrate its standing to seek declaratory relief adjudging the Secretary's interpretation in error, and injunctive relief requiring the promulgation of a new interpretation, the plaintiff contended that the Secretary's interpretation increased the rate of extinction of endangered species abroad, which would cause injury to its members, some of whom had observed endangered species abroad in the past or had attempted to do so, but whose interest in viewing endangered wildlife abroad in the future would be threatened as a result of the Secretary's

erroneous interpretation. *See id.* at 562–63, 112 S.Ct. 2130.

The Supreme Court held that the association lacked standing because its members, who by affidavit had expressed an intention to return to foreign nations to observe endangered species, lacked sufficiently immediate plans to do so:

> [The affidavits] plainly contain no facts ... showing how damage to the species will produce "imminent" injury to [plaintiff's members]. That the [affiants'] "had visited" the [foreign nations] proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse affects.' " And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* at 564, 112 S.Ct. 2130 (citation omitted) (emphasis, last alteration, and last omission original).

Defendants' reliance on *Defenders of Wildlife* is misplaced for two reasons. First, Plaintiff Clark, unlike the plaintiff in *Defenders of Wildlife*, has at least offered a "specification of *when* the some day will be." It will be "upon remediation," i.e., the day that the architectural barriers alleged to exist at the restaurants Clark has visited are removed or cured. If the "futile gesture" language of Title III is to mean anything, it means that those in Clark's position may sue to bring into compliance with the ADA places of public accommodation that they know are non-complaint, without having to allege an intention to return to such places before their lawsuits can have the effect of forcing compliance.

■ More significantly, however, Defendants' argument treats the amended complaint as seeking injunctive relief solely to prevent threatened future injury, ignoring Clark's allegation that he is presently being injured by Defendants' discriminatory conduct. To the extent Clark is presently "discouraged from patronizing" the restaurants he has visited on account of his "aware[ness] of the discriminatory barriers [he] will encounter there," (Am.Compl.¶¶ 52–53), such discouragement constitutes an actual and existing injury from which any perceived absence of imminent future harm cannot detract. As explained in *Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133 (9th Cir. 2002), for a plaintiff to enjoy standing to seek an injunction under Title III of the ADA, he must have "suffered actual *or* imminent injury. We hold that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.' " *Id.* at 1138 (emphasis added); *cf. Sammon v. N.J. Bd. of Med. Exam'rs,* 66 F.3d 639, 642–43 (3d Cir.1995).

Stated otherwise, today's deterrence from visiting a place of public accommodation known to be out-of-compliance with the ADA can constitute an actual and present injury as surely as tomorrow's visit to the same location can constitute a threatened and imminent one. The showing of imminence required by *Defenders of Wildlife* is simply unnecessary to the extent Clark seeks injunctive relief to remedy today's "actual harm," *see* 504 U.S. at 565 n. 2, 112 S.Ct. 2130, or "continuing, present adverse effects" from his past exposure to Defendants' allegedly illegal conduct, *see id.* at 564, 112 S.Ct. 2130.

### 4. CLARK'S STANDING TO ASSERT CLAIMS AS TO McDONALD'S RESTAURANTS HE HAS NOT VISITED

■ Fourth, Defendants contend that Clark lacks standing to assert claims as to McDonald's restaurants that he has not himself visited. Their position is supported by *Moreno v. G & M Oil Co.,* 88 F.Supp.2d 1116 (C.D.Cal.2000), in which the court concluded that the private enforcement provision of Title III did not permit a plaintiff encountering

architectural barriers at one gas station to assert claims on behalf of others similarly situated with respect to 82 other gas stations that the plaintiff had not himself visited. *Id.* at 1117.

Initially, it may be observed that the Court's holding that the proposed Defendant Class and Defendant Subclass may not be certified, *see* discussion *supra* Parts II.D.1–2, has the effect of excluding from this litigation restaurants owned or operated by McDonald's franchisees (except Ygraine) in the absence of their individual joinder as parties defendant. *See* Fed.R.Civ.P. 20(a). Accordingly, Defendants' present challenge to Clark's standing is germane only to the extent that, if successful, it would preclude Clark from asserting claims seeking relief as to corporate restaurants owned or operated by Defendant McDonald's that Clark has not himself visited.

The Court declines Defendants' invitation to rule on the question of whether a plaintiff who has not himself visited a place of public accommodation enjoys standing to assert Title III claims as to that location. The Court only decides that if the answer is "yes," then it must be because the plaintiff, within the meaning of Title III's enforcement provision, 42 U.S.C. § 12188(a)(1), has "actual notice" of an ADA violation existing at a location he has not yet visited. In the case at bar, Clark does not allege "actual notice" of any ADA violation at any of the corporate-owned McDonald's restaurants that he has not visited. The closest he comes to doing so is to allege (1) that "the discriminatory features of Defendants' facilities are *generally known* to ... Clark," (Am. Compl. ¶ 52 (emphasis added)), and (2) that he has "discovered material violations of the ADA" at 38 corporate-owned McDonald's restaurants in Wisconsin, (*id.* ¶ 39), pursuant to an investigation conducted by professional inspectors hired by Plaintiffs' attorneys, (*see id.* ¶ 38).

As to the former allegation, it would be unreasonable for the Court to infer "actual notice" of an ADA violation at a particular restaurant that Clark has not visited from whatever "general[ ] know[ledge]" he may possess about discriminatory features said to be commonplace at McDonald's restaurants.

As to the latter, even if it is reasonable to infer that Clark has "actual notice" of ADA violations at Wisconsin restaurants he has not visited via hired inspectors—a matter the Court does not decide—Clark nevertheless lacks standing to assert claims as to those restaurants because he has not alleged (and is not excused from alleging) that he would visit the Wisconsin restaurants but for the violations of which he has actual notice. (*Compare id.* ¶ 38 (alleging Clark's intent to return to corporate-owned restaurants within New Jersey that he has visited).)

### 5. CLARK'S STANDING TO ASSERT CLAIMS REGARDING ARCHITECTURAL BARRIERS NOT RELATED TO PARAPLEGIA

Finally, Defendants contend that Clark lacks standing to assert claims regarding architectural barriers that do not relate to Clark's particular disability of paraplegia. For example, Defendants urge that Clark, who, so far as the allegations of the amended complaint reveal, is not seeing or hearing impaired, lacks standing to contest ADA violations involving the absence of Braille characters or volume controls. Plaintiffs concede the point. (*See* Tr. Oral Arg. of 1/28/03 at 29:20–23; *cf. id.* 45:9–46:13.)

### F. CHALLENGES TO PLAINTIFFS' STATE LAW CLAIMS

In addition to the standing and Rule 23 challenges already discussed, Defendants have presented a trio of arguments directed against Plaintiffs' claims arising under the laws of the Subclass States. Defendants maintain (1) that such claims are alleged in such conclusory fashion as to warrant dismissal under Rule 12(b)(6) for failure to state a claim upon which relief may be granted; (2) that the Court lacks supplemental jurisdiction over such claims because they do not derive from a common nucleus of operative facts, or should decline to exercise supplemental jurisdiction under the authority of 28 U.S.C. § 1367(c); and (3) that the Court should decline to exercise personal jurisdiction over non New Jersey franchisees against whom such claims are sought to be asserted. The last of these arguments is mooted by the

Court's holding, *see* discussion *supra* Parts II.D.1–2, that the proposed Defendant Class and Defendant Subclass may not be certified, which has the effect of leaving Ygraine, a New Jerseyan, as the sole franchisee defendant. The Defendants' remaining arguments are rejected below.

### 1. PLAINTIFFS' STATE LAW CLAIMS ARE SUFFICIENTLY PLEADED.

■ The face of the amended complaint makes apparent that the claims Plaintiffs have advanced under the anti-discrimination laws of the Subclass States proceed on the theory that violations of the ADA constitute per se violations of such laws. So understood, Defendants cannot be heard to claim that the pleading fails to apprise them of the nature of Plaintiffs' state law claims, and to the extent Defendants have advanced such an argument, it is rejected.

Citing *McKenna v. Pacific Rail Service*, 32 F.3d 820 (3d Cir.1994), Defendants advance the closely related but distinct argument that a complaint must direct the defendant to the factual cause of the plaintiff's alleged injury, and that Plaintiffs have failed to identify whatever injuries may have given rise to their compensatory damages claims under state law. (*See* Def. McDonald's Mem. Law Supp. Mot. Dismiss Am. Compl. at 31.) At issue in *McKenna* was a complaint brought under the New Jersey Law Against Discrimination to redress age discrimination in employment, which had prayed for "a judgment ordering defendant to offer [plaintiffs] employment and to pay back wages, compensatory damages, punitive damages and attorneys' fees." *Id.* at 832. At trial, the jury awarded the plaintiffs compensation for future lost earnings in the amount of five million dollars, but the district court granted a post-trial motion to strike the front pay award as a sanction for plaintiffs' surfacing their front pay claim for the first time in proposed jury instructions submitted two weeks before trial. *Id.* On appeal, the Third Circuit affirmed the sanction under an abuse-of-discretion standard notwithstanding the plaintiffs' argument that their prayer for "compensatory damages" had encompassed a front pay award. *Id.* The appellate panel concluded that

> in the context of the pleadings filed in this case, we cannot say that [plaintiffs'] vague pleading style—even under the lenient rules of notice pleading—sufficed to put [the defendant] upon notice of a claim for front pay.

*Id.*

Here, the Court is presented with a pleading which, like the one in *McKenna*, prays generally for "compensatory damages" under state law while leaving unsaid the nature of the injuries for which compensation is sought. However, the Court does not read *McKenna*—as Defendants apparently do—to require Plaintiffs to catalogue in their pleading the injuries for which they seek compensatory damages under the antidiscrimination laws of the Subclass States in order to survive a motion to dismiss. The Third Circuit has elsewhere criticized attorneys for failing to discern that "there is no requirement that damages be pleaded with any greater particularity in civil rights cases than in other cases," *Waltz v. County of Lycoming*, 974 F.2d 387, 389 (3d Cir.1992), and the *McKenna* decision itself permitted an unspecified claim for "emotional distress damages" to go forward as a silent component of the prayer for "compensatory damages." *See id.* at 833–34; *see also id.* at 827 n. 6.

Rather, *McKenna* is better understood as a cautionary tale that it is possible to plead oneself right out of court on a particular damages claim (e.g., "front pay") by specifying (though not required to do so under notice pleading standards) another damages claim (e.g., "back pay") the presence of which in the context of the pleading would appear to suggest the absence of the particular claim sought to be asserted. *McKenna* is not the last decision in this Circuit to teach complainants that they may specify compensatory damages in their pleadings at their peril. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666–67 (3d Cir.2002). The disclosure of compensatory damages categories is an initial discovery requirement, *see* Fed.R.Civ.P. 26(a)(1)(C), not a pleading requirement.

### 2. SUPPLEMENTAL JURISDICTION IS PROPER OVER PLAINTIFFS' STATE LAW CLAIMS.

■ Defendants argue that Plaintiffs' state law claims do not "derive from a common nucleus of operative facts" as necessary to maintain supplemental jurisdiction over them. *See Lyon v. Whisman*, 45 F.3d 758, 760 (3d Cir.1995). The Court disagrees. The case at bar is a "common nucleus" prototype. *See id.* at 761 ("[W]hen the same acts violate parallel federal and state laws, the common nucleus of operative facts *is obvious* . . . ." (emphasis added)).

The real question is whether the Court should exercise discretion to decline supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c), which permits a district court to do so, for purposes here relevant, if

> (1) the claim raises a novel or complex issue of State law,

> (2) the claim substantially predominates over the [federal] claim or claims over which the district court has original jurisdiction, [or]

> . . . .

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* Defendants propose that the Court decline jurisdiction (1) under § 1367(c)(1), because Plaintiffs' claims "raise[ ] complex issues of varying non-New Jersey state and local laws"; (2) under § 1367(c)(2), because "the money damages claims involving millions of putative class plaintiffs and thousands of putative defendants requiring millions of jury trials substantially predominate over the federal ADA claims"; and (3) under § 1367(c)(4), because "exceptional circumstances concerning the unmanageability of this action provide compelling reasons for declining jurisdiction." (Def. McDonald's Mem. Law Supp. Mot. Dismiss Am. Compl. at 32.)

Defendants have failed to substantiate these arguments. No unsettled or complex feature of state law applicable to this suit has been identified by the Defendants, which is grounds enough for rejecting their challenge under subdivision (c)(1). *E.g., Busey v. Bd. of County Comm'rs*, 163 F.Supp.2d 1291, 1295 (D.Kan.2001); *U.S. W., Inc. v. Bus. Discount Plan, Inc.*, 196 F.R.D. 576, 594 (D.Colo.2000). Defendants have similarly failed to identify what "important countervailing interest [is] to be served by relegating state claims to . . . state court" as is necessary to justify invocation of subdivision (c)(2). *See Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir.1995). Finally, Defendants cite no authority for the proposition that the potential unmanageability of adjudicating state law claims could constitute an "exceptional circumstance" within the meaning of subdivision (c)(4). *But cf. Channell v. Citicorp Nat'l Serv., Inc.*, 89 F.3d 379, 387 (7th Cir.1996). Although the potential remains for this litigation to reach a crossroads where the better course may be to decline supplemental jurisdiction over claims arising under the laws of the Subclass States, or some of them, the parade of horribles summoned by the Defendants is unpersuasive to effect that result.

### G. DEFENDANTS' MOTION FOR A MORE DEFINITE STATEMENT

■ Defendants have moved, in the alternative to their motion to dismiss the amended complaint, for an order under Rule 12(e) of the Federal Rules of Civil Procedure requiring Plaintiffs to submit a more definite statement. Rule 12(e) provides that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Whether to grant a motion under Rule 12(e) is a matter committed largely to the discretion of the district court. *See McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir.1996); *Hodgson v. Va. Baptist Hosp., Inc.*, 482 F.2d 821, 824 (4th Cir.1973); *Page Steel & Wire Co. v. Blair Eng'g Co.*, 22 F.2d 403, 407 (3d Cir. 1927).

The prevailing standard employed by district courts in this Circuit is to grant such a motion "when the pleading is 'so vague or ambiguous that the opposing party cannot

respond, even with a simple denial, in good faith, without prejudice to [itself].'" *Sun Co. v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 368 (E.D.Pa.1996) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1376 (1990)); *see Murray v. Gencorp, Inc.*, 979 F.Supp. 1045, 1050–51 (E.D.Pa.1997); *Wood & Locker, Inc. v. Doran & Assocs.*, 708 F.Supp. 684, 691 (W.D.Pa.1989); *Lincoln Labs., Inc. v. Savage Labs., Inc.*, 26 F.R.D. 141, 143 (D.Del.1960). Examples where this standard has been met are where the allegations of a complaint are not sufficiently specific to enable a defendant to determine the propriety of interposing in his answer a waivable defense, *see Lunderstadt v. Colafella*, 885 F.2d 66, 68–69 (3d Cir.1989); *Murray*, 979 F.Supp. at 1051, or where, in the absence of certain information peculiarly within the knowledge of the plaintiff, the defendant cannot, in good faith, answer the complaint with a general denial, *see Lincoln Labs.*, 26 F.R.D. at 143.

■ Motions for a more definite statement are also an appropriate vehicle to pare down "shotgun" pleadings. By requiring more definiteness, issue may be joined on particular claims, discrete defenses can be interposed in discrete fashion, and the litigation may be made more manageable, through more controlled discovery, to the benefit of the litigants and the district court alike. *See Anderson v. Dist. Bd. of Trustees of Cent. Fla. Community Coll.*, 77 F.3d 364, 366–67 (11th Cir.1996); *Byrne v. Nezhat*, 261 F.3d 1075, 1128–34 (11th Cir.2001); *cf. Microtron Corp. v. Minn. Mining & Mfg. Co.*, 269 F.Supp. 22, 26 (D.N.J.1967).

■ Defendants ask that the Court require Plaintiffs to specify

(1) all of the restaurants that allegedly have ADA violations; (2) the date(s) when the plaintiffs encountered those violations at each restaurant; (3) what the particular violations are at each restaurant; (4) what problems were encountered on each visit and the damages from that encounter; and (5) what each plaintiff's disabilities are.

(Def. McDonald's Brief Supp. Mot. More Def. Stmt. at 1.)

Plaintiffs resist Defendants' motion with several arguments. Plaintiffs maintain that their claims are intelligible, that they have satisfied the notice pleading requirements of Rule 8(a)(2), that they need not plead with the particularity required by Rule 9(b) in the absence of fraud or mistake claims, and that they should not be required to plead the minutiae that will ultimately be ascertained by discovery. Plaintiffs point out that they have provided in their amended complaint specific examples of "commonplace violations" of the ADA at Defendants' restaurants and the specific disabilities suffered by Access Today's membership, and claim that Rule 12(e) "was not intended to place the unreasonable burden on plaintiffs of personally inspecting and measuring over 13,000 restaurants to determine precisely the ADA violations contained therein prior to filing this class action suit." (Pls.' Mem. Law Opp'n Def. McDonald's Mot. More Def. Stmt. at 2.)

■ A plaintiff's compliance with the "short and plain statement" standard of Rule 8(a)(2), and success in stating a claim upon which relief may be granted under Rule 12(b)(6), does not insulate its pleading from a well-grounded motion for a more definite statement under Rule 12(e). In fact, Rule 12(e)'s *raison d'être* is to require greater specificity than what is ordinarily required under Rule 8(a)(2) in that narrow class of cases where the want of specificity precludes the defendant from properly framing an answer to a legally sufficient complaint. However, to the extent Rule 12(e) can be implemented to require more than what is required by Rules 8(a)(2) and 12(b)(6), and may thereby be prone to abuse by defendants, "its exercise should be cast in the mold of strictest necessity." *Lincoln Labs.*, 26 F.R.D. at 142; *see also Mitchell v. E–Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir.1959) ("In view of the great liberality of F.R.Civ.P. 8, permitting notice pleading, it is clearly the policy of the Rules that Rule 12(e) should not be used to frustrate this policy by lightly requiring a plaintiff to amend his complaint which under Rule 8 is sufficient to withstand a motion to dismiss.").

In this case, the Defendants have not identified any waivable defense that Plaintiffs' lack of specificity precludes them from asserting in good faith, except to say that "[d]ates are required . . . so the timeliness of the action can be determined," (Def. McDonald's Brief Supp. Mot. More Def. Stmt. at 2), suggesting the possible assertion of an affirmative limitations defense.[26] Rather, Defendants' argument is directed to the breadth of the amended complaint, which—even absent franchised restaurants—has the potential to encompass approximately 3000 McDonald's locations. The salient point made by the Defendants is that Plaintiffs' counsel admitted at a May 21, 2002, scheduling conference with the Court that approximately 150 McDonald's restaurants had been visited and that alleged ADA problems were found to exist at only approximately one third of them, yet the amended complaint makes no allowance for non-offending restaurants.

In other words, there is a "shotgun" component to Plaintiffs' amended complaint, which does not discriminate between the restaurants known to be in violation of the ADA from those which are not, and which, among the restaurants known to be in violation, does not discriminate between architectural barriers known to exist from those which are not. The upshot of Plaintiffs' pleading style is that, with the exception of the 55 corporate restaurants identified in the amended complaint, McDonald's is simply left to guess as to which of its remaining 2945 restaurants are alleged to violate the ADA, and how so. Without information as to which of its restaurants are at issue, McDonald's can neither admit, nor in good faith deny, the allegations of ADA violations. It is not too much for Plaintiffs to specify in their amended complaint the restaurants of which they have actual notice of ADA violations, which is a matter peculiarly within their knowledge. Cf. Lincoln Labs., 26 F.R.D. at 143 ("Defendant should not be required to guess which of the plaintiff's 60 trademarks he is supposed to be infringing when it would be a simple matter for the plaintiff to specify his pleadings in this respect."). Plaintiffs shall also be required to identify the dates on which each McDonald's restaurant was visited, so that Defendants may discern the availability of any limitations defense that may be applicable to a claim for compensatory damages under the laws of the Subclass States.

Defendants' remaining requests for definiteness under Rule 12(e) shall be denied. The Court fails to see how a specification of the "problems encountered on each visit and damages" therefrom, or the identification of "each plaintiff's disabilities" are necessary to frame a responsive pleading. As to Defendants' request for definiteness concerning the particular ADA violations at each restaurant, the Court declines to require greater specificity for two reasons. First, once McDonald's is apprised as to which of its restaurants are at issue, it should be able determine from its own inspection or records its compliance or non-compliance with the ADA, as to enable it to either admit or deny the existence of such violations. Second, there is the possibility that Plaintiffs cannot adequately specify in their pleading each architectural barrier at a given McDonald's restaurant because the inability to negotiate one architectural barrier may have prevented the discovery of another. Cf. Steger, 228 F.3d at 893–94.

### III. CONCLUSION

Defendants' motions (1) to dismiss the amended complaint, or in the alternative, to dismiss or strike its class action allegations, and (2) for a more definite statement are granted in part and denied in part for the reasons set forth herein. An appropriate Order shall issue.

### ORDER

For the reasons expressed in an Opinion of even date, the motion of Defendants McDonald's and Ygraine to dismiss the amended complaint, or in the alternative, to dismiss or strike its class action allegations, is

---

**26.** Even then, the availability of a limitations defense would appear to be applicable, if at all, only to state law claims for damages, such as, for example, a claim for compensatory damages resulting from a visit to an inaccessible McDonald's restaurant where the visit occurred beyond the limitations period made applicable by the law of one of the Subclass States.

GRANTED IN PART and DENIED IN PART; and the motion of Defendants McDonald's and Ygraine for a more definite statement is GRANTED IN PART and DENIED IN PART; and

IT IS ORDERED that the claims brought by Plaintiff Access Today in its own right for declaratory and injunctive relief under Title III of the ADA are DISMISSED; and it is further

ORDERED that the claims brought by Plaintiff Access Today in its own right for compensatory damages under the anti-discrimination laws of the Subclass States are DISMISSED; and it is further

ORDERED that the claims brought by Plaintiff Access Today on behalf of its members for compensatory damages under the anti-discrimination laws of the Subclass States are DISMISSED; and it is further

ORDERED that the claims brought by Plaintiffs Clark and Access Today concerning restaurants for which Clark, or another member of Access Today, obtained actual notice of the existence of a violation of Title III of the ADA only after the commencement of this action are DISMISSED; and it is further

ORDERED that the claims brought by Plaintiffs Clark and Access Today concerning restaurants for which neither Clark, nor any member of Access Today, has obtained actual notice of the existence of a violation of Title III of the ADA are DISMISSED; and it is further

ORDERED that the claims brought by Plaintiff Clark regarding architectural barriers that do not relate to Clark's particular disability of paraplegia are DISMISSED; and it is further

ORDERED that the amended complaint's prayer for certification of a Defendant Class and Defendant Subclass is STRICKEN; and it is further

ORDERED that in accordance with Parts II.E.1 and II.G of the accompanying Opinion, Plaintiffs shall, upon pain of dismissal of the remainder of the amended complaint without prejudice, serve and file on or before March 24, 2003, a second amended complaint that specifies (1) by location, each McDonald's brand restaurant as to which Plaintiffs claim actual notice of a violation of Title III of the ADA, and (2) by restaurant, the date that Plaintiff Clark, or another member of Access Today, visited, or otherwise obtained actual notice, of a violation of Title III of the ADA; and it is further

ORDERED that any amendments to Plaintiffs' pleadings beyond those required by the previous paragraph shall, if they cannot be obtained by written consent, *see* Fed. R.Civ.P. 15(a), be sought by motion in conformity with Rule 7.1(e)(2) of the Local Civil Rules of the United States District Court for the District of New Jersey; and it is further

ORDERED that Defendants answer Plaintiffs' second amended complaint in accordance with the schedule provided for by Rules 12(a)(4)(B) and 6(a) of the Federal Rules of Civil Procedure.

**SO ORDERED.**